# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
May 25, 2016 Session Heard at Cookeville[1]

## STATE OF TENNESSEE v. JOHN HENRY PRUITT

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Hickman County**
**No. 11-5005-CR      Timothy L. Easter, Judge**

_____

**No. M2013-02393-SC-R11-CD**
**FILED DECEMBER 30, 2016**

_____

We granted this appeal to consider whether the Court of Criminal Appeals incorrectly held in *State v. Hayes*, No. M2012-01768-CCA-R3-CD, 2013 WL 3378320, at *7 (Tenn. Crim. App. July 1, 2013), *no perm. app. filed*, that retroactive application of the Exclusionary Rule Reform Act, Tennessee Code Annotated section 40-6-108, would violate constitutional protections against ex post facto laws and to re-evaluate the ex post facto analysis in *Miller v. State*, 584 S.W.2d 758 (Tenn. 1979), in light of *Collins v. Youngblood*, 497 U.S. 37 (1990).  Having concluded that *Miller* was wrongly decided, we overrule *Miller* and hold that the ex post facto clause of the Tennessee Constitution has the same definition and scope as the federal ex post facto clause.  To be an ex post facto violation, a law must be retroactive in its application and must fall within one of the four categories set forth in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (opinion of Chase, J.).  We conclude that the Exclusionary Rule Reform Act is not an ex post facto statute as applied in this case and that as a result, the Defendant's motion to suppress the evidence against him was not well-taken.  In addition, we conclude that the Defendant's issues regarding the sufficiency of the evidence to convict him and to sentence him to life without the possibility of parole do not entitle him to relief.  Accordingly, the judgments of the Court of Criminal Appeals are affirmed on the separate grounds stated herein.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., CORNELIA A. CLARK, SHARON G. LEE, and HOLLY KIRBY, JJ., joined.

---

[1] We heard oral argument in this case on May 25, 2016, at Tennessee Technological University in Cookeville, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Vanessa Pettigrew Bryan, District Public Defender; J. Gregory Burlison (at trial and on appeal), and Robert Jones (at trial), Assistant District Public Defenders, for the appellant, John Henry Pruitt.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Sarah K. Campbell, Special Assistant to the Solicitor General and the Attorney General; Kim Helper, District Attorney General; Michael J. Fahey and Kate Yeager, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

On October 18, 2010, John Henry Pruitt ("the Defendant"), shot three people in his front yard, two of whom died. The third victim was paralyzed. The responding law enforcement officers shot the Defendant four times. The Hickman County Grand Jury indicted him for two counts of first degree premeditated murder (victims Amber Hopkins and John Louis Luster), one count of attempted premeditated murder (victim James E. Kennedy), and three counts of aggravated assault (victims Deputy Jody Simmons, Detective Johnny Davis, and Deputy Ricky Harness). On March 16, 2012, the Defendant filed a motion to suppress evidence seized from his residence based upon an allegedly illegal search warrant.[2] After a pretrial hearing on April 13, 2012, the trial court[3] denied the Defendant's motion, ruling that Tennessee Code Annotated section 40-6-108,[4] commonly known as the Exclusionary Rule Reform Act ("ERRA"), applied to the case

---

[2] The Defendant also filed a motion to suppress a statement given by him to Tennessee Bureau of Investigation agents. The trial court denied this motion, and it is not a subject of this appeal.

[3] Judge Derek K. Smith presided over the suppression hearing.

[4] Tennessee Code Annotated section 40-6-108(a), which became effective on July 1, 2011, provides as follows:

> Notwithstanding any law to the contrary, any evidence that is seized as a result of executing a search warrant issued pursuant to this part or pursuant to Tennessee Rules of Criminal Procedure Rule 41 that is otherwise admissible in a criminal proceeding and not in violation of the constitution of the United States or Tennessee shall not be suppressed as a result of any violation of this part or any violation of Tennessee Rules of Criminal Procedure Rule 41 if the court determines that such violation was a result of a good faith mistake or technical violation made by a law enforcement officer, court official, or the issuing magistrate as defined in subsection (c).

- 2 -

despite ex post facto concerns because it was a procedural statute, that the mistake in the search warrant was a good faith or technical violation of Tennessee Rule of Criminal Procedure 41, and that the mistake did not require the exclusion of evidence.[5]  The evidence presented at the suppression hearing and the Defendant's trial is set forth below.

At the suppression hearing,[6] the documents entered as exhibits include the affidavit in support of the search warrant (which was dated October 18), the search warrant itself (which has two dates, October 19 above the magistrate's signature and October 18 on the "Issued on" line), and the search warrant return (dated October 18). Hickman County Sheriff's Department Chief Deputy Scott Smith[7] testified that he wrote the search warrant affidavit and signed it on October 18, 2010.  He met with the magistrate, who found probable cause for the search and "issued" the warrant at 11:53 p.m. on October 18.  He acknowledged that October 19 was the date listed above the magistrate's signature.  Chief Deputy Smith stated that the date might have changed "in between the time that she issued [the search warrant] and [when] she signed it."  We understand his testimony to mean that the magistrate might have dated the "Issued on" line prior to signing and dating the signature line.  Chief Deputy Smith conjectured that because the time was "so close to midnight," either it had become October 19 by the time she signed the warrant or that her timepiece was incorrect.  He stated that he called the officers at the scene immediately after the signing of the search warrant.[8]  Chief Deputy Smith acknowledged that the date on the warrant return was October 18, stating that he was referring back to the date on the search warrant when he entered the date on the return.  He denied that the search warrant was executed prior to its signing.  Chief Deputy Smith testified that a box of ammunition was recovered from the Defendant's residence and that officers saw a shotgun in the residence during the search.  According to Tennessee Bureau of Investigation ("TBI") Agent Mike Cox, the investigators did not know that the shotgun had any significance until a witness mentioned it.  Agent Cox obtained a waiver from the Defendant to allow investigators to collect the shotgun. Because the Defendant's sister had already obtained the shotgun from the residence, Chief Deputy Smith recovered the shotgun from her.

Witnesses at the Defendant's trial testified that one of the victims, Amber Hopkins, had been in a relationship with the Defendant for approximately a year prior to

---

[5]  We note that the constitutionality of ERRA has not been challenged on separation of powers grounds in this appeal.

[6]  For the sake of brevity, we have omitted testimony unrelated to the issues in this appeal.

[7]  Chief Deputy Smith was a detective at the time of the suppression hearing.  He received a promotion prior to trial.

[8]  The parties did not raise the manner in which the search warrant was served as an issue.

her death. Ms. Hopkins lived with the Defendant during that year, with the exception of a week that she spent at the residence of James "Elvis" Kennedy, some three to four weeks before the incident in question. Mr. Kennedy described his relationship with Ms. Hopkins as "friends with benefits," noting that they had known each other since they were teenagers. Mr. Kennedy testified that he helped Ms. Hopkins move her things out of the Defendant's residence several weeks before her death, and in the Defendant's statement to Agents Vance Jack and Mike Cox, the Defendant said that Ms. Hopkins returned to his home after several days at Mr. Kennedy's residence.

On October 17, 2010, Ms. Hopkins went to Honda Hills, a recreational area, to ride four-wheelers with Mr. Kennedy and her daughter.[9] Ms. Hopkins' daughter was in an accident that resulted in a broken wrist and required a visit to the hospital. According to Ms. Hopkins' mother, Belinda Conley, Ms. Hopkins asked the Defendant to take them to the emergency room, and when he refused, Mr. Kennedy took them instead. While Ms. Hopkins and Mr. Kennedy were at the hospital, the Defendant went to Ms. Conley's house.

Ms. Hopkins and Mr. Kennedy arrived at Ms. Conley's house soon after the Defendant. According to Mr. Kennedy, the Defendant thanked him for bringing the young girl home, but when the Defendant began conversing with Ms. Hopkins, the Defendant became angry. Ms. Conley described the Defendant as being upset when he left her house. Ms. Hopkins spent the night at Mr. Kennedy's house that evening.

The following day, October 18, Mr. Kennedy worked until noon and then ran errands with Ms. Hopkins. His friend and co-worker, John Luster, was at his house when they returned around 6:00 p.m. The three of them then went to the Defendant's house in Mr. Kennedy's truck. They planned to pick up Ms. Hopkins' belongings, which were supposed to be by the roadside. According to Mr. Kennedy, he had not had any alcohol that day, but Mr. Luster drank a beer on the way to the Defendant's house.

When they arrived at the Defendant's house, Mr. Kennedy parked in front of the pile of Ms. Hopkins' possessions. He and Mr. Luster both exited the truck while Ms. Hopkins remained inside. Mr. Kennedy began putting Ms. Hopkins' belongings in the bed of his truck, and he was standing at his truck's tailgate when he first saw the Defendant. Mr. Kennedy testified that the Defendant had "a rifle on his shoulder and a pistol in his hand." Mr. Kennedy yelled to Mr. Luster that the Defendant had a gun.

Mr. Kennedy said that he was standing on the back of his truck when he was shot under his right arm. He fell to the ground but pulled himself up enough to see Ms.

---

[9] Mr. Kennedy referred to the young girl as Ms. Hopkins' niece, but Belinda Conley identified her as Ms. Hopkins' daughter.

Hopkins lying on the seat of the truck. He again fell to the ground and could not move his legs. Mr. Kennedy recalled the Defendant's pointing a double-barreled, twelve-gauge shotgun at his head and his telling Mr. Kennedy to get up. Mr. Kennedy said that the Defendant told him to move to the front of the truck so the Defendant could see Mr. Kennedy's face. Mr. Kennedy managed to move himself to the front of his truck and proceeded to beg for his life. He said that he heard Ms. Hopkins' voice and then "heard a thump hit the ground." Believing that the Defendant had dragged Ms. Hopkins out of the truck, Mr. Kennedy looked to the side and saw her. Mr. Kennedy testified that Ms. Hopkins said, "Johnny, don't touch me," repeatedly. She looked at Mr. Kennedy and told him, "I'm sorry." Thereafter, Mr. Kennedy heard the Defendant talking on the telephone.

The Defendant called several people after the shooting. Having already called Belinda Conley multiple times during the day to relay messages to Ms. Hopkins, he called her again between 7:10 and 7:15 p.m., telling her, "[T]hey're all dead." The Defendant told Ms. Conley that he was sorry and hung up. The Defendant also called 9-1-1. He told the dispatcher his name and location, that three people had come into his home, and that he had shot them. The Defendant's brother-in-law, Billy Alvin Hannah, also received a call from the Defendant that evening.

Hickman County Sheriff's Deputy Jody Simmons[10] was the first law enforcement officer to arrive at the Defendant's house. He had met the Defendant's sister and brother-in-law at the turn onto the Defendant's road and followed them to the Defendant's house. When he arrived at 7:30 p.m., he saw a black truck in the road with its doors open and "bodies lying on the ground in the yard." The Defendant was standing on his porch with a gun in his hand. Deputy Richard Harkness arrived soon thereafter, and he and Deputy Simmons took cover behind the doors of Deputy Simmons' car. They tried to talk the Defendant into dropping his weapon, and Deputy Simmons fired his Taser at the Defendant. However, the Taser did not reach him.

Centerville Police Detective Johnny Davis[11] was the next to arrive at the Defendant's house. The Defendant was kneeling in the driveway. Detective Davis testified that he had been to the Defendant's house before because he had returned a Colt .380 pistol to the Defendant after the pistol had been stolen and recovered. Detective Davis reminded the Defendant who he was, and the Defendant said, "You're the man that brought me this weapon[,] and you're the man that's going to have to kill me with it." According to Detective Davis, the Defendant stood up, took two steps backward, and

---

[10] At the time of trial, Deputy Simmons was employed by the Centerville Police Department; however, in October 2010, he worked for both the police department and the sheriff's department.

[11] Detective Davis worked for both the police department and the sheriff's department, but he testified that he was on duty for the police department on the night in question.

raised his pistol. Detective Davis shot the Defendant in the right arm, causing the Defendant to drop the pistol. Deputy Simmons saw the Defendant reaching for the pistol with his left hand and proceeded to shoot the Defendant three times in the torso. According to Detective Davis, the Defendant's sister grabbed the pistol, and he secured it from her.

Two of the shooting victims, Ms. Hopkins and Mr. Luster, died at the scene. The medical examiner testified that Mr. Luster had been shot once in his torso. Ms. Hopkins had been shot twice in her right hip. Mr. Kennedy was paralyzed by the bullet that lodged in his spine. He explained that the bullet remained there because its removal would cause additional paralysis or death.

Investigators recovered four .380 cartridge cases from the Defendant's yard and three .380 bullets from the deceased victims. Forensic testing showed that the bullets recovered from the victims had been fired through the Defendant's weapon. When the laboratory received the Defendant's pistol and its magazine, the magazine contained six bullets. Detective Davis had ejected a seventh bullet from the pistol's chamber, and testimony indicated that the pistol could contain a maximum of eight bullets. Testing of the victims' clothing showed no signs of nitrites, gunpowder, or lead vapor, which would have been present if the muzzle of the weapon had been closer than five feet to the garments. Pursuant to the search warrant obtained by Chief Deputy Scott Smith, officers seized a box of .380 ammunition from the Defendant's residence, and they later obtained from the Defendant's sister a shotgun originally seen in the residence.

TBI Agents Mike Cox and Vance Jack assisted the local authorities in their investigation, with Agent Cox investigating the homicides and Agent Jack investigating the officer-involved shooting of the Defendant. The agents interviewed the Defendant at Vanderbilt University Medical Center on October 21, 2010. A recording of the Defendant's statement was played for the jury.

According to the Defendant, when Ms. Hopkins arrived with Mr. Kennedy and Mr. Luster, one of the men was cursing at him and threatened to "cut" him. When the man reached for the Defendant, the Defendant shot him. He said that Ms. Hopkins and the other man began running toward him, that he panicked, and that he shot them, once each. The Defendant stated that he only had one gun that evening and that he fired three times. The Defendant told the agents that he did not shoot to kill the victims. According to the Defendant, he had been diagnosed with mental health problems during the 1980s or 1990s. The day of the shooting he drank two to three beers and took his prescriptions for Lortab and Xanax. After the shooting, he called 9-1-1 and Ms. Hopkins' mother. When the law enforcement officers arrived, the Defendant told them that he wanted them to kill him, but he denied pointing his gun at them. The Defendant told the agents that he was attempting to give his gun to Detective Davis when the other officer shot him. When

- 6 -

agents described to the Defendant a knife that they had found on his porch, he stated his belief that the knife belonged to him.

On behalf of the Defendant, Casey Clemons testified that she drove by the Defendant's house on the evening of the shooting.[12] She remembered seeing a red car but could not remember anything else about that day. Ms. Clemons agreed that her statement to law enforcement taken two weeks after the shooting would be accurate, including her saying that she saw two men in the yard and saw two people in a pickup truck, but she could not determine whether the document shown to her was her statement. In response to her testimony, Chief Deputy Smith testified that he interviewed Ms. Clemons on November 1, 2010, and that she told him she had seen a pickup truck parked in front of the Defendant's house with two people inside the truck. She also saw a pile of property in the yard and a younger man arguing with an older man in the yard. She did not see any firearms.

Also on the Defendant's behalf, his sister Mary Nell Hannah and his brother-in-law Billy Hannah testified about the events after they arrived at the scene. According to Mr. Hannah, the Defendant was holding his gun to the side and pointed at the ground. An officer shot the Defendant's arm, causing the Defendant to drop the gun, and Mrs. Hannah picked up the gun. Then, the officers shot the Defendant three times. Mr. Hannah recalled the Defendant's telling the officers that there was one bullet left in his gun and that he planned to use it on himself. Mrs. Hannah described essentially the same scenario, adding that the Defendant was trying to hand her the gun when he was shot the first time. She claimed that she already had the gun when he was shot again. Mrs. Hannah further testified that she had raised the Defendant to an extent after the separation of their parents and that he had been a "good kid." According to her, the Defendant was on medication for "nerves" and depression, and he had trouble with his vision but could not afford glasses. The investigator hired by the Defendant's attorney testified that he found a closed knife on the Defendant's porch the day following the shooting, which he turned over to the sheriff's department.

Following the close of proof and deliberations, the jury convicted the Defendant as charged of two counts of first degree premeditated murder, one count of attempted first degree premeditated murder, and three counts of aggravated assault.

At the sentencing hearing to determine punishment for the first degree murder convictions, Mr. Luster's mother testified about the impact of his death on their family, especially his nine-year-old son. For the defense, Rebecca Barnett, a mitigation specialist, testified that the Defendant dropped out of school at fifteen or sixteen and that he worked steadily until 2010. He had been married twice, both marriages resulting in

---

[12] Ms. Clemons testified by deposition due to a medical situation.

divorce. He had two sons from his first marriage, but one son had been killed in an accident. Ms. Barnett testified that the Defendant tried to kill himself after his first divorce. She further testified that a mental evaluation given to the Defendant prior to trial showed that the Defendant had "significant physical and mental limitations." He was diagnosed with "major depressive disorder with psychotic features." The Defendant also suffered from a heart murmur and nerve damage from a motorcycle accident. The jury determined that one aggravating circumstance applied to the Defendant's sentencing—he knowingly created a great risk of death to two or more persons other than the victim murdered—and on that basis, the jury sentenced him to life sentences without the possibility of parole for the murders of Amber Hopkins and John Luster. *See* Tenn. Code Ann. § 39-13-204(i)(3).

After a second sentencing hearing to determine punishment for the remaining convictions, the trial court sentenced the Defendant to twenty-five years for the attempted murder of James Kennedy and six years for each of the three aggravated assault convictions. The trial court ordered the attempted murder sentence to be served consecutively to the Defendant's murder sentences and the aggravated assault convictions to be served concurrently with each other and the attempted murder sentence.

The Defendant appealed to the Court of Criminal Appeals, arguing that the trial court erred by denying his motion to suppress the evidence and that the evidence was insufficient to support his convictions for the murders and the attempted murder, as well as his sentences of life without the possibility of parole. *State v*. *Pruitt*, No. M2013-02393-CCA-R3-CD, 2015 WL 5032016, at *1 (Tenn. Crim. App. Aug. 26, 2015), *perm. app. granted* (Tenn. Jan. 19, 2016). The appellate court concluded that the search warrant did not violate Tennessee Rule of Criminal Procedure 41(c) because "the correct date and time were in fact endorsed on the warrant" and because "the date October 19, 2010, . . . on the warrant . . . was rendered 'extraneous and inapplicable' when the magistrate stated on the warrant that the document was 'Issued on Oct. 18, 2010.'" *Id.* at *12. Addressing the trial court's reliance on ERRA, the appellate court noted that ERRA would apply but for the fact that the Court of Criminal Appeals had previously determined in *State v. Hayes* that ERRA could not be applied retroactively to validate a warrant. *Id.* (citing *State v. Hayes*, No. M2012-01768-CCA-R3-CD, 2013 WL 3378320, at *5 (Tenn. Crim. App. July 1, 2013)). The court further concluded that the seizure of the shotgun did not violate the Defendant's constitutional rights because he had voluntarily agreed to the seizure. *Id.* The court upheld the Defendant's convictions and sentences, ruling that the evidence was sufficient to support his convictions and that the evidence was sufficient to support the aggravating circumstance found by the jury in sentencing. *Id.* at *12, *15.

The Defendant filed a timely Rule 11 application to this Court, which we accepted with the instruction to address whether *State v. Hayes* was correctly decided and whether

this Court should modify the Tennessee ex post facto analysis found in *Miller v. State*, 584 S.W.2d 758 (Tenn. 1979), in light of *Collins v. Youngblood*, 497 U.S. 37 (1990). The other issues raised in the Defendant's application are sufficiency of the evidence to uphold his convictions and sufficiency of the evidence to uphold the aggravating circumstance relied upon by the jury in sentencing him to life without the possibility of parole for each count of premeditated murder.

## II. Analysis

### A. *Suppression of the Evidence*

#### 1. Standard of Review

In reviewing the trial court's decision on a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (alteration in original) (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23. "The question whether Rule 41(c) of the Tennessee Rules of Criminal Procedure requires suppression of the evidence in this case is a question of law which we review de novo with no presumption of correctness afforded to the judgment of the court below." *State v. Coffee*, 54 S.W.3d 231, 232 (Tenn. 2001).

#### 2. Search Warrant

At issue in this case is a search warrant purported by the Defendant to be invalid based on a failure to adhere to the specifications of Tennessee Rule of Criminal Procedure 41(c). Rule 41 "imposes specific procedural safeguards" that "are intended 'to secure the citizen against carelessness and abuse in the issuance and execution of search warrants.'" *Coffee*, 54 S.W.3d at 233 (quoting *Talley v. State*, 345 S.W.2d 867, 869 (1961)). As relevant to this case, Rule 41(c)(3)(D) requires that the magistrate "endorse on the search warrant the hour, date, and name of the officer to whom the warrant was

delivered for execution." Tenn. R. Crim. P. 41(c)(3)(D). If a magistrate does not comply with that section, Rule 41 directs a court to grant an aggrieved party's motion to suppress the evidence seized as a result of the noncompliant warrant. Tenn. R. Crim. P. 41(g)(5)(B). The purpose of Rule 41(c)'s endorsement criteria is "to ensure that if a search warrant is executed prior to its issuance, such discrepancy will be apparent on the face of the warrant." *State v. Bobadilla*, 181 S.W.3d 641, 645 (Tenn. 2005). As we stated in *Bobadilla*, "We have interpreted these rules strictly; the language is plain and the requirements are mandatory." *Id.* (citing *Coffee*, 54 S.W.3d at 233-34).[13]

The search warrant in this case has two dates. Above the magistrate's signature, the date listed is October 19, 2010. Below the magistrate's signature, the warrant reads, "Issued on Oct. 18, 2010." The time listed is 11:53 p.m. The search warrant return was dated October 18, 2010. At the suppression hearing, Detective Smith suggested that there might have been a discrepancy between his timepiece and the magistrate's timepiece, that by the time the magistrate signed the warrant, the time had passed midnight and the date had changed to October 19, or that the magistrate simply made a mistake. In any event, because the purpose of Rule 41(c) is to ensure that a discrepancy between a warrant's issuance and execution is apparent on the face of the warrant, we must disagree with the Court of Criminal Appeals that the October 19 date was merely extraneous. Thus, if Rule 41 alone were controlling, the search warrant would be invalidated.

However, the legislature promulgated ERRA in 2011, which states:

> (a) Notwithstanding any law to the contrary, any evidence that is seized as a result of executing a search warrant issued pursuant to this part or pursuant to Tennessee Rules of Criminal Procedure Rule 41 that is otherwise admissible in a criminal proceeding and not in violation of the constitution of the United States or Tennessee shall not be suppressed as a result of any violation of this part or any violation of Tennessee Rules of Criminal Procedure Rule 41 if the court determines that such violation was a result of a good faith mistake or technical violation made by a law enforcement officer, court official, or the issuing magistrate as defined in subsection (c).

---

[13] However, that is not to say that there are no exceptions to Rule 41's exclusionary rule. Recently, this Court has discussed Rule 41 in two cases, *State v. Reynolds* and *State v. Davidson*. *State v. Davidson*, --- S.W.3d. ---, No. E2013-00394-SC-DDT-DD, slip op. at 20 (Tenn. Dec. 19, 2016); *State v. Reynolds*, --- S.W.3d ---, No. E2013-02309-SC-R11-CD, 2016 WL 6525856, *21 (Tenn. Nov. 3, 2016). In each of those cases, this Court determined that Rule 41 did not prevent the Court from adopting exceptions to the exclusionary rule. *Davidson*, slip op. at 20; *Reynolds*, 2016 WL 6525856, *21. "[W]e note that Rule 41(g), a procedural rule promulgated by this Court, does not divest this Court of its authority to decide whether a good-faith exception, or any other exception, should be adopted." *Davidson*, slip op. at 20 (citing *Reynolds*, 2016 WL 6525856, *21).

(b) This section does not limit or prohibit the enforcement of any appropriate civil remedy in actions pursuant to other provisions of law against any individual or government entity found to have conducted an unreasonable search or seizure; provided, however, that unless otherwise provided by federal law or the constitution of Tennessee, if any evidence is seized as a result of a good faith mistake or technical violation, as defined in subsection (c), the individual or government entity shall not be civilly liable.

(c) As used in this section, unless the context otherwise requires, "good faith mistake or technical violation" means:

> (1) An unintentional clerical error or clerical omission made by a law enforcement officer, court official or issuing magistrate in the form, preparation, issuance, filing and handling of copies, or return and inventory of a search warrant;

> (2) When the officer to whom the warrant is delivered for execution is not present during the execution but an officer with law enforcement authority over the premises does otherwise execute the search warrant;

> (3) A reasonable reliance on a statute that is subsequently ruled unconstitutional; or controlling court precedent that is overruled after the issuance of a search warrant, unless the court overruling the precedent orders the new precedent to be applied retroactively.

Tenn. Code Ann. § 40-6-108. ERRA was effective on the date of the suppression hearing but not when the offenses were committed in this case. The Defendant contends that application of ERRA to his case is an ex post facto violation, an argument with which the Court of Criminal Appeals agreed. *See Pruitt*, 2015 WL 5032016, at \*12. After an exhaustive review of ex post facto jurisprudence, we hold that ERRA applies to the Defendant's case and overrule *Miller* and *Hayes*. We also take the opportunity to revise the ex post facto analysis for our state bench and bar.

### 3. Ex Post Facto Analysis

Both the federal and state constitutions prohibit ex post facto laws. The United States Constitution has two clauses containing the prohibition, one aimed at Congress—

Article 1, section 9, clause 3—and the other aimed at the States—Article 1, section 10, clause 1, which provides that "[n]o State shall . . . pass any . . . ex post facto Law." The Tennessee Constitution in Article 1, section 11 states, "That laws made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal, are contrary to the principles of a free Government; wherefore no Ex post facto law shall be made." The animating principle of the prohibition against ex post facto laws is basic fairness, as the United States Supreme Court explained in *Peugh v. United States*:

> Our holding today is consistent with basic principles of fairness that animate the *Ex Post Facto* Clause. The Framers considered *ex post facto* laws to be "contrary to the first principles of the social compact and to every principle of sound legislation." The Federalist No. 44, p. 282 (C. Rossiter ed. 1961) (J. Madison). The Clause ensures that individuals have fair warning of applicable laws and guards against vindictive legislative action. *See Weaver v. Graham*, 450 U.S. 24, 28-29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) . . . . Even where these concerns are not directly implicated, however, the Clause also safeguards "a fundamental fairness interest . . . in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life." *Carmell*[ *v. Texas*, 529 U.S. 513, 533 (2000)].

*Peugh v. United States*, 133 S.Ct. 2072, 2084-85 (2013) (second alteration in original).

The most significant case to interpret the ex post facto clause of the federal constitution was *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798). Justice Chase explained in *Calder* that the prohibition against ex post facto laws was intended to prevent such "acts of violence and injustice" as had been committed by the British Parliament. *Id.* at 389.[14] Justice Chase then described four categories of laws that would be included in the constitutional prohibition against ex post facto laws:

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or

---

[14] For further historical information regarding the development of ex post facto laws, see then-Judge Koch's opinion in *Utley v. Tenn. Dep't of Correction*, 118 S.W.3d 705, 714-18 (Tenn. Ct. App. 2003).

- 12 -

different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id*. at 390. These four categories have been the mainstay of federal case law in this area ever since, although there have been expansions, contractions, and refinements in the following centuries.

For example, in *Kring v. Missouri*, 107 U.S. 221 (1883), the United States Supreme Court reasoned that the *Calder* categories were not all-encompassing and stated its preference for a broader construction, such as

"an *ex post facto* law is one which, in its operation, makes that criminal which was not so at the time the action was performed, or which increases the punishment, *or, in short, which, in relation to the offense or its consequences, alters the situation of a party to his disadvantage*."

*Kring*, 107 U.S. at 228-230 (quoting Justice Washington's jury charge in *United States v. Hall*, 26 F. Cas. 84, 86 (C.C.D. Penn. 1809) (No. 15,285), *aff'd sub nom. United States v. Hall*, 10 U.S. 171 (1810)). As part of this expansion of ex post facto jurisprudence, the Court in *Kring* also determined that many changes to rules of criminal procedure work to the disadvantage of defendants and should be deemed ex post facto legislation. *Id.* at 232.

However, the very next year, the Court found that a change to an evidentiary rule did not violate the prohibition against ex post facto laws. As the Court set forth in *Hopt v. Utah*, 110 U.S. 574, 587-88 (1884), Utah had changed its rules of criminal procedure to expand the class of people who were qualified to testify at trials by allowing felons to testify. In Hopt's case, when the offense in question was committed, felons could not testify in court. *Id.* By the time of his trial, the rules had changed, and a felon gave testimony that "tended to implicate the defendant in the crime charged against him." *Id.* at 587. The Court compared Hopt's case to *Kring*, noting that in *Kring*, the Court had found that a substantial right of the defendant had been deprived. *Id.* The Court in *Hopt* determined that the change of law affecting the defendant did not deprive him of a substantial right and echoed the *Calder* categories when it determined that:

[s]tatutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done, nor aggravate any crime theretofore committed, nor provide a greater punishment therefor than was prescribed at the time of its commission, nor

do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.

110 U.S. at 589. The *Hopt* Court went on to say that the change in the law it was considering "relate[d] to modes of procedure only, in which no one can be said to have a vested right, and which the state, upon grounds of public policy, may regulate at pleasure." *Id.* at 590. Finally, the Court stated, "Such regulations of the mode in which the facts constituting guilt may be placed before the jury can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offense charged." *Id.*

The more narrow view of ex post facto jurisprudence won out over the *Kring* Court's broad construction, but the language in *Kring* about altering a defendant's situation to his disadvantage continued to be influential. In *Beazell v. Ohio*, 269 U.S. 167, 170 (1925), the Court stated, "But it is now well settled that statutory changes in the mode of trial or the rules of evidence, which do not deprive the accused of a defense and which operate only in a limited and unsubstantial manner to his disadvantage, are not prohibited." Then, in *Lindsey v. Washington*, the Court cited *Kring* to support its statement that "[t]he Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." 301 U.S. 397, 401 (1937) (citing *Thompson v. Utah*, 170 U.S. 343, 351 (1898); *In re Medley,* 134 U.S. 160, 171 (1890); *Kring*, 107 U.S. at 228-29). By the time the Court decided *Dobbert v. Florida* in 1977, the Court had clearly pulled away from *Kring*'s broad construction. *See Dobbert v. Florida*, 432 U.S. 282, 293 (1977) ("Even though it may work to the disadvantage of a defendant, a procedural change is not ex post facto."). Nevertheless, the Court continued to use the term "disadvantage" in *Weaver v. Graham* when it articulated the two elements that must exist for a law to be ex post facto: "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29 (1981) (footnotes omitted) (citing *Lindsey*, 301 U.S. at 401; *Calder*, 3 U.S. (3 Dall.) at 390).

The Court finally overruled *Kring* in the landmark case of *Collins v. Youngblood* in 1990. 497 U.S. at 50. In *Collins*, the Court reviewed the history of ex post facto jurisprudence in an attempt to arrive at the original understanding of ex post facto. *Id.* at 41-52. In particular, the Court noted the wide acceptance of the *Calder* categories as the exclusive definition of ex post facto laws and referred to other historical sources— Blackstone's Commentaries and early state constitutions that gave fuller descriptions of ex post facto laws than did the federal constitution—to support the proposition that only

laws falling into the *Calder*[15] categories would be ex post facto laws. *Id.* at 42-44. The appellant in *Collins* argued for a broader construction that would prohibit retroactive legislation "if it deprives an accused of a 'substantial protection' under law existing at the time of the crime." *Id.* at 44. In analyzing this issue, the Court determined that "confusion" existed in the interpretation of the ex post facto clause because some prior cases stated that procedural changes would not violate the clause while other cases stated that even procedural changes might violate the clause if the changes deprived a defendant of "'substantial protections with which the existing law surrounds the person accused of crime.'" *Id.* at 45 (quoting *Duncan v. Missouri*, 152 U.S. 377, 382-83 (1894)) (citing *Dobbert*, 432 U.S. at 292-93 & n.6; *Beazell*, 269 U.S. at 171; *Mallett v. North Carolina*, 181 U.S. 589, 597 (1901)). The Court resolved the apparent conflict in these cases by clarifying "that the constitutional prohibition is addressed to laws, 'whatever their form,' which make innocent acts criminal, alter the nature of the offense, or increase the punishment." *Id.* at 46 (citations omitted). The Court stated that merely calling a statute "procedural" would not prevent examination under the ex post facto clause and that references to "substantial protections" in prior cases did not mean that the Court had expanded its interpretation of the clause. *Id.*

This was not the end of the Court's analysis, however. The Court determined that two cases—*Kring* and *Thompson v. Utah*—represented an unjustified departure from the original understanding of the prohibition against ex post facto laws. *Id.* at 47-52. "These cases have caused confusion in state and lower federal courts about the scope of the *Ex Post Facto* Clause . . . ." *Id.* at 47. The *Collins* Court wrote:

> The holding in *Kring* can only be justified if the *Ex Post Facto* Clause is thought to include not merely the *Calder* categories, but any change which "alters the situation of a party to his disadvantage." We think such a reading of the Clause departs from the meaning of the Clause as it was understood at the time of the adoption of the Constitution, and is not supported by later cases. We accordingly overrule *Kring*.

*Id*. at 50. The Court also overruled *Thompson*, in which a change from the right to have a twelve-person jury when the crime was committed to an eight-person jury at the time of trial was held to have "'deprive[d] him of a substantial right involved in his liberty' and 'materially alter[ed] the situation to his disadvantage.'" *Id*. at 51 (alterations in original) (quoting *Thompson*, 170 U.S. at 352-53).

---

[15] The Court actually referred to the *Beazell*, 269 U.S. at 169-70, recitation of the categories, but this formulation included only three of the original four *Calder* categories. *Collins*, 497 U.S. at 42-43. The Court made clear in *Carmell*, 529 U.S. at 539, that all four of the original categories remain viable.

Until 1979, Tennessee followed federal precedent with regard to ex post facto analysis. *See Stinson v. State*, 344 S.W.2d 369, 372 (Tenn. 1961); *Davis v. Beeler*, 207 S.W.2d 343, 349-50 (Tenn. 1947). Then, in *Miller v. State*, 584 S.W.2d 758 (Tenn. 1979), this Court determined that the state constitution provided broader ex post facto protections than did the federal constitution and added a fifth category—"Every law which, in relation to the offense or its consequences, alters the situation of a person to his disadvantage,"—to the original four from *Calder v. Bull*. *Miller*, 584 S.W.2d at 761 (citing *State v. Rowe*, 181 A. 706, 710 (N.J. 1935)). This Court did not provide any reasoning to support the expanded ex post facto protections; instead, the *Miller* Court merely quoted the state ex post facto clause and declared that it was "sufficiently broad to proscribe the application of a statute fixing punishment in excess of that provided by a law in effect at the time of the commission of an offense." *Id.*

The language for the fifth category was derived from *Rowe*, 181 A. at 710, a New Jersey Supreme Court case. In that case, the New Jersey Supreme Court listed the original four *Calder* categories and two additional categories derived from a secondary source. 181 A. at 709. The court also made the following observation:

> "Throughout the several jurisdictions, variations of and extentions [sic] to the foregoing have occurred, and such, 'to make the classification sufficiently general to embrace all the laws which have been adjudged ex post facto,' have been assembled by [the *Corpus Juris* encyclopedia] into a further class, viz.: 'Every law which, in relation to the offense or its consequences, alters the situation of a person to his disadvantage.'"

*Id.* at 709-10 (quoting *Lindsley v. Bd. of Managers of N.J. State Prison*, 151 A. 294, 295 (N.J. 1938)). Two things are clear from this recitation: (1) the *Corpus Juris* categorization was intended to be a catch-all, and (2) the language for this categorization and the spirit behind it were derived from *Kring*, a case that has since been overruled because "it was a mistake to stray beyond *Calder*'s four categories." *Carmell*, 529 U.S. at 539 (emphasis omitted).

In the decades since *Miller*, its impact on ex post facto analysis has been minimal. This court has never relied solely on the fifth category in determining the outcome of a case and has cited the fifth category as one of its reasons for finding an ex post facto violation only once. *State v. Odom*, 137 S.W.3d 572, 582-83 (Tenn. 2004). In *State v. Pearson*, this court arrived at somewhat of a compromise between the federal and state ex post facto analyses:

> Accordingly, in determining whether an ex post facto violation exists in the context of sentencing, the critical question under both the United States and Tennessee Constitutions is whether the law changes the punishment to the

> defendant's disadvantage, or inflicts a greater punishment than the law
> allowed when the offense occurred.

858 S.W.2d 879, 883 (Tenn. 1993). The *Miller* Court's determination that the state constitution provides broader ex post facto protections than the federal constitution and the fifth category of ex post facto laws it introduced have been often ignored or relegated to a parenthetical or footnote. *See, e.g., State v. Rogers,* 992 S.W.2d 393, 401-02 (Tenn. 1999), *aff'd*, 532 U.S. 451 (2001) (listing the four *Calder* categories and including *Miller*'s fifth category in a parenthetical); *State v. Pike*, 978 S.W.2d 904, app. at 925-26 (Tenn. 1998) (citing *Miller* but not mentioning its expanded categories of ex post facto laws); *State v. Ashby*, 823 S.W.2d 166, 167 (Tenn. 1991) (ignoring *Miller* entirely); *Smith v. Campbell*, 995 S.W.2d 116, 118-19 (Tenn. Ct. App. 1999) (citing *Miller* but leaving out the fifth category); *Kaylor v. Bradley*, 912 S.W.2d 728, 731-32 (Tenn. Ct. App. 1995) (listing only the *Calder* categories and concluding that this Court and the United States Supreme Court agree "that two elements must be present in order for a criminal or penal law to run afoul of the Ex Post Facto Clause. First, the law must apply retrospectively to events occurring before its enactment. Second, the law must disadvantage the offender affected by it."); *State v. Young*, 904 S.W.2d 603, 607 (Tenn. Crim. App. 1995); *State v. Godsey*, No. 52, 1991 WL 50180, at *2 n.1 (Tenn. Crim. App. 1991); *Griffin v. State*, 595 S.W.2d 96, 100 (Tenn. Crim. App. 1980).

However, the Court of Criminal Appeals has relied on the fifth category occasionally, including in the case *sub judice*. *See State v. Hayes*, No. M2012-01768-CCA-R3-CD, 2013 WL 3378320, at *6-8 (Tenn. Crim. App. July 1, 2013) (relying on *Hanners* and *Miller* and ruling that the defendant's altered situation did not have to relate to his offense or punishment); *State v. Hanners*, 235 S.W.3d 609, 612-13, 613 n.2 (Tenn. Crim. App. 2007) ("The Tennessee Supreme Court also indicated in *Miller* that the Ex Post Facto Clause of the Tennessee Constitution has a broader reach and provides more protection than its federal counterpart. Therefore, whether a person is 'disadvantaged' by the law is a valid inquiry in a Tennessee ex post facto analysis; whereas, the federal analysis has shifted away from this more lenient standard." (citations omitted)). It is because of these cases that we are now reconsidering the analysis of ex post facto laws in *Miller*.

Generally, "this Court will not interpret a state constitutional provision differently than a similar federal constitutional provision unless there are sufficient textual or historical differences, or other grounds for doing so." *Phillips v. Montgomery Cnty.*, 442 S.W.3d 233, 243 (Tenn. 2014). Justice Harbison, writing for the dissent in *Miller*, wrote:

> The Constitution of Tennessee has neither been cited, briefed nor
> argued in this case. I think that it is an unfortunate development in
> constitutional law for the Court, [s]ua sponte, to conclude that the term "ex

- 17 -

post facto" has a different meaning in the Constitution of Tennessee from the identical words used in the Constitution of the United States. Heretofore, the courts of this state, in discussing ex post facto laws, have cited and relied upon interpretations of Article I, Section 10, of the United States Constitution, and there has never been the slightest suggestion that the provisions of the Tennessee Constitution were any different in content, scope and meaning from those in the federal constitution. *See Stinson v. State*, 208 Tenn. 159, 344 S.W.2d 369 (1961); *Davis v. Beeler*, 185 Tenn. 638, 207 S.W.2d 343 (1947).

*Miller*, 584 S.W.2d at 763 (Harbison, J., dissenting). We agree with Justice Harbison. The *Miller* Court did not analyze whether there were any such differences before declaring that the Tennessee clause provided more expansive protections. If anything, the ex post facto clause of the Tennessee Constitution could be read more narrowly than the federal clause based on the text because the state clause specifies that ex post facto laws are those "made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal." TENN. CONST. art. I, § 11.

As for the history of the state clause, our clause is similar to the ones relied upon in *Calder* by Justice Chase in reaching his definition. In particular, Justice Chase relied in part on the definition of ex post facto found in the constitution of North Carolina. *Calder*, 3 U.S. at 391-92.[16] The Tennessee clause was included in the 1796 Constitution's Declaration of Rights, which was largely drawn from North Carolina's Constitution of 1776. *See* Lewis L. Laska, *A Legal and Constitutional History of Tennessee, 1792-1972*, 6 MEM. ST. U. L. REV. 563, 592-94 (1975-1976). Thus, Justice Chase's defining of "ex post facto" came after the term had already been defined in the constitutions of North Carolina and Tennessee. The early state constitutions that included prohibitions against ex post facto laws, including that of North Carolina, actually influenced the framers of the federal constitution. *See Collins*, 497 U.S. at 43. Indeed, the North Carolina Supreme Court in *Dickinson v. Dickinson*, 7 N.C. (3 Mur.) 327, 329-30 (1819), treated Justice Chase's definition as expanding the definition of "ex post facto" rather than limiting it.[17] Justice Chase explained that "[t]he expressions 'ex

---

[16] "Retrospective laws, punishing acts committed before the existence of such laws and by them only declared criminal, are oppressive, unjust, and incompatible with liberty, and therefore no ex post facto law shall be enacted." N.C. CONST. art. I, § 16. North Carolina's courts analyze state and federal ex post facto claims "under the same definition." *North Carolina v. Wiley*, 565 S.E.2d 22, 45 (N.C. 2002).

[17] In the course of determining whether the North Carolina ex post facto clause encompassed the aggravation of a defendant's punishment by a statute passed after the criminal conduct, the court called Justice Chase's definition of "ex post facto laws" a judicial construction of the concept and then applied it to the state court's interpretation of the state clause. *Dickinson*, 7 N.C. (3 Mur.) at 329-30.

post facto laws,' are technical, they had been in use long before the Revolution, and had acquired an appropriate meaning, by Legislators, Lawyers, and Authors." *Calder*, 3 U.S. at 391. In other words, "ex post facto" is "a term of art" with a meaning that was already established "at the time of the framing of the Constitution." *Collins*, 497 U.S. at 41 (citing *Calder*, 3 U.S. at 391, 396-97 (opinions of Chase, J., and Paterson, J.)). As the *Collins* court reasoned, any expansion of the *Calder* definition is inconsistent "with the understanding of the term '*ex post facto* law' at the time the Constitution was adopted." *Id.* at 47.

There is simply nothing in the text of our constitution nor in our history that supports the *Miller* Court's holding that the meaning of "ex post facto" in Tennessee is more expansive than the definition provided by Justice Chase in 1798. Therefore, we conclude that the holding of *Miller* must be overruled to the extent that it expanded the meaning of the Tennessee ex post facto clause beyond the meaning of the federal ex post facto clause. *See In re Estate of McFarland*, 167 S.W.3d 299, 306 (Tenn. 2005) ("Generally, well-settled rules of law will be overturned only when there is obvious error or unreasonableness in the precedent . . . ."); *see also State v. McCormick*, 494 S.W.3d 673, 683-85 (Tenn. 2016) (discussing the role of stare decisis). In so doing, we hold that the ex post facto clause of the Tennessee Constitution has the same definition and scope as the federal clause.

We now turn our attention to examining whether application of ERRA to validate the search warrant in the Defendant's case is an ex post facto violation. To violate the ex post facto clause, a statute must fall within one of the four *Calder* categories. Stated another way, "[t]o fall within the *ex post facto* prohibition, a law must be retrospective— that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it,' . . . by altering the definition of criminal conduct or increasing the punishment for the crime . . . ." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (quoting *Weaver*, 450 U.S. at 30) (citing *Collins*, 497 U.S. at 50).

The first question, therefore, is whether the application of ERRA in this case was retroactive. "The *Ex Post Facto* Clause raises to the constitutional level one of the most basic presumptions of our law: legislation, especially of the criminal sort, is not to be applied retroactively." *Johnson v. United States*, 529 U.S. 694, 701 (2000). "A law is retrospective if it 'changes the legal consequences of acts completed before its effective date.'" *Miller v. Florida*, 482 U.S. 423, 430 (1987) (quoting *Weaver*, 450 U.S. at 31), *abrogated in part by California Dept. of Corrections v. Morales*, 514 U.S. 499, 506 n.3 (1995). However, "intervening procedural changes" may be upheld "even if application of the new rule operated to a defendant's disadvantage in the particular case." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 275 n.28 (1994). Nonetheless, merely labeling a law "procedural" does not prevent review under the ex post facto clause, *see Collins*, 497 U.S. at 46, because "it is the effect, not the form, of the law that determines whether it is

*ex post facto*," *Weaver*, 450 U.S. at 31. "The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name." *Cummings v. Missouri*, 71 U.S. 277, 325 (1866). As the *Collins* Court wrote, "[T]he prohibition which may not be evaded is the one defined by the *Calder* categories." *Collins*, 497 U.S. at 46.

The United States Supreme Court and this Court have each upheld changes in the law that occurred after an offense but before a trial when those changes were procedural and did not fall into one of the *Calder* categories. *See Collins*, 497 U.S. at 52; *Dobbert*, 432 U.S. at 293-94; *Thompson v. Missouri,* 171 U.S. 380, 387 (1898) (stating that "we cannot perceive any ground upon which to hold a statute to be ex post facto which does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed"); *Hopt*, 110 U.S. at 589; *Pike*, 978 S.W.2d at app. at 925-26; *Ashby*, 823 S.W.2d at 167 ("There is no authority for the position that legislative changes in the standard of review by appellate courts are ex post facto laws."); *State v. Pilkey*, 776 S.W.2d 943, 945 (Tenn. 1989) (citations omitted) ("The trial . . . occurred well after the effective date of the statutes[,] and we find no merit to the suggestion by appellant that the statutes were applied in such a way as to constitute ex post facto laws in any constitutional sense."). *But see Odom*, 137 S.W.3d at 581 (citation omitted) ("Although the distinction between substantive and procedural law has been recognized by the courts of this state, we have not applied this distinction in capital sentencing.").

The form of ERRA is clearly procedural: it is found in the criminal procedural title of the Tennessee Code and is a modification of a rule of criminal procedure. *See* Tenn. Code Ann. § 40-6-108. In addition, the nature of the statute also lends itself to a conclusion that it is a procedural/remedial statute because the exclusionary rule itself "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved," *United States v. Calandra*, 414 U.S. 338, 348 (1974), whereas the ex post facto clause provides "fair warning of applicable laws and guards against vindictive legislative action," *Peugh*, 133 S. Ct. at 2085.

Most importantly, however, the statute does not fall into any of the *Calder* categories. It does not make an action criminal which was innocent when done; it does not aggravate a crime; it does not change the punishment for the crime; nor does it change the rules of evidence so that less or different testimony is required to convict the offender. *See Calder*, 3 U.S. at 390. We recognize that some of the evidence against the Defendant would have been excluded but for ERRA; however, this is not the same as "reducing the quantum of evidence required to convict[,] . . . eliminating an element of the offense, . . . or lowering the burden of proof," all actions that are addressed by *Calder*'s fourth category. *See Carmell*, 529 U.S. at 532.

- 20 -

To return to the specific facts of the case before us, two dates were written on the search warrant—October 18 and October 19. The search warrant return was dated October 18. At the suppression hearing, Chief Deputy Scott Smith testified that the warrant was not executed until the magistrate was finished issuing it. The trial court found that ERRA applied to validate the search warrant because the mistake in the date was "a good faith mistake or technical violation." While not stated explicitly, based on the evidence presented to resolve this issue—the warrant itself and Chief Deputy Smith's testimony—the court's ruling had to turn on Chief Deputy Smith's credibility. The actual error itself is a textbook example of a clerical error made during the preparation of a search warrant. *See* Tenn. Code Ann. § 40-6-108(c)(1). Chief Deputy Smith's testimony, implicitly found by the trial court to be credible, tends to show that the clerical error was unintentional. *See id.* Therefore, we conclude that the error in the date was a good faith or technical mistake and that the trial court properly ruled that, pursuant to ERRA, the evidence should not be suppressed. Furthermore, this pretermits the Defendant's other evidentiary issue concerning the admission of the shotgun.

## B. *Sufficiency of the Evidence*

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, the Defendant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *see also State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This Court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at

379. Because a jury conviction removes the presumption of innocence that the defendant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted defendant, who must demonstrate to this Court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The Defendant was convicted of two counts of premeditated murder and one count of attempted premeditated murder. He does not deny that he fired the rounds that killed Mr. Luster and Ms. Hopkins and paralyzed Mr. Kennedy; instead, he asserts that he was justified in his use of force because Mr. Luster, who was a large man and was under the influence of alcohol, threatened "to cut" him. He argues that Mr. Kennedy's version of events was not credible based on Ms. Clemons' testimony about what she saw driving by the Defendant's property. In particular, he raises the "true man" doctrine to support his argument that he acted in self-defense.

Pursuant to Tennessee Code Annotated section 39-11-611(b) (2009),

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

    (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

    (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

    (C) The belief of danger is founded upon reasonable grounds.

The "no duty to retreat rule," also known as the "true man" doctrine, holds that "one need not retreat from the threatened attack of another even though one may safely do so." *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995). "[T]his doctrine applies only: (1) when the Defendant is without fault in provoking the confrontation, and (2) when the

Defendant is in a place where he has a lawful right to be and is there placed in reasonably apparent danger of imminent bodily harm or death." *Id.* (citations omitted). The "true man" doctrine does not give a person the right to begin a confrontation or to escalate a confrontation unreasonably, and the force used must be reasonable under the circumstances. *Id.* Whether the "true man" doctrine applies in a particular case is a jury question. *Id.*

Viewed in the light most favorable to the State, the evidence at trial showed that none of the victims were armed, and two of the victims, Mr. Kennedy and Ms. Hopkins, could not have been involved in any confrontation, even if one believed the Defendant's story about Mr. Luster's threat to him. Ms. Hopkins was sitting inside the truck when the Defendant shot her, and Mr. Kennedy was standing on the back of his truck when the Defendant shot him. The evidence also showed that all of the victims were shot from more than five feet away. In addition, even if true, the Defendant's confession showed that he escalated any confrontation. "The jury determines not only whether a confrontation has occurred, but also which person was the aggressor. It also decides whether the Defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the Defendant was without fault." *Id.* The jury resolved any conflicts in the testimony against the Defendant, as was their prerogative. We conclude that the evidence was sufficient to support the Defendant's convictions and for the jury to reject the Defendant's self-defense claim.

## C. *Sufficiency of the Evidence – Aggravating Circumstance (i)(3)*

The Defendant has framed his final argument as a matter of the sufficiency of the evidence to support the imposition of sentences of life without the possibility of parole. The crux of his argument, however, is that the mitigating factors should have outweighed the aggravating circumstance.

The State did not seek the death penalty in this case; therefore, when the jury convicted the Defendant of two counts of first degree murder, it then had to determine whether to sentence him to life or life without the possibility of parole. Tenn. Code Ann. § 39-13-202(c), -207. The State relied on one aggravating circumstance: "The Defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of the murder." *See* Tenn. Code Ann. § 39-13-204(i)(3). The Defendant submitted three mitigating factors pursuant to Tennessee Code Annotated section 39-13-204(j):

(1)     The defendant has no significant history of prior criminal activity;

(8)     The capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the

- 23 -

requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment; and

(9)    Any other mitigating factor that is raised by the evidence produced by either the prosecution or defense, at either the guilt or sentencing hearing.

For factor number nine, the Defendant relied on his history of gainful employment.  At the sentencing hearing, he also presented evidence that he was raised in a broken home and had a major depressive disorder.  The jury determined that the State had proven aggravating circumstance (i)(3) beyond a reasonable doubt and sentenced the Defendant to life without the possibility of parole on each premeditated murder charge.

"The relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt."  *State v. Nesbit*, 978 S.W.2d 872, 887 (Tenn. 1998) (citing *State v. Cazes*, 875 S.W.2d 253 (Tenn. 1994)).  "This Court has previously held that [the (i)(3)] aggravating circumstance 'contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based.'"  *Johnson v. State*, 38 S.W.3d 52, 60 (Tenn. 2001) (footnote omitted) (quoting *State v. Cone,* 665 S.W.2d 87, 95 (Tenn. 1984)).  Such is clearly the case here, where the Defendant killed two people and wounded a third.  We conclude that a rational trier of fact could have found that aggravating circumstance (i)(3) was proven beyond a reasonable doubt.  Once an aggravating circumstance has been proven, the decision whether to sentence a defendant to life or to life without the possibility of parole is in the jury's "considered discretion." Tenn. Code Ann. § 39-13-207(c).  The Defendant has not shown that "the sentence was . . . imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion."  Tenn. Code Ann. § 39-13-207(g).  Therefore, we conclude that the Defendant's sentence is supported by the evidence.

## CONCLUSION

We overrule *Miller*, hold that the state ex post facto clause and the federal ex post facto clause have the same definition, and conclude that the application of Tennessee Code Annotated section 40-6-108 to this case was not an ex post facto violation. Accordingly, we conclude that the trial court properly refused to suppress the evidence obtained as a result of the search warrant.  The judgments of the Court of Criminal Appeals are affirmed on the separate grounds stated herein with regard to the suppression and ex post facto issues and are affirmed as written regarding the Defendant's remaining

issues.  It appearing that the Defendant, John Henry Pruitt, is indigent, costs will be taxed to the State of Tennessee.

_____
ROGER A. PAGE, JUSTICE