IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 8, 2019 Session

## STATE OF TENNESSEE v. ROBERT BELT[1]

**Appeal from the Criminal Court for Shelby County**
**No. 15-06145          Lee V. Coffee, Judge**

_____

### No. W2018-00785-CCA-R3-CD
_____

A Shelby County jury convicted the Defendant-Appellant, Robert Belt, of first-degree, premeditated murder of Delvin Brown, the victim in this case. He was also convicted of murder during the perpetration of robbery and especially aggravated robbery. The trial court merged the murder convictions and imposed an effective sentence of life plus twenty-five years' imprisonment. In this appeal as of right, the Defendant presents the following issues for our review: (1) whether the trial court erred in denying the Defendant's motion to suppress; (2) whether the evidence is sufficient to convict the Defendant of first-degree murder; and (3) whether the trial court erred in ordering the sentences to be served consecutively. Upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Barry W. Kuhn, Assistant Public Defender, for the Defendant-Appellant, Robert Belt.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Leslie Fouche, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

Along with his girlfriend, co-defendant Jocelin Williams, the Defendant devised a plan to rob the victim, a known drug dealer, which ultimately led to the victim's death. On the night of the offense, co-defendant Jocelin Williams called Shuntavia Louden, the victim's girlfriend, and asked if the victim would sell co-defendant Williams some marijuana. Louden believed the victim would, and she agreed to go to the victim's home

---

[1] The Defendant was tried jointly with co-defendant Jocelin Williams.

along with co-defendant Williams and her boyfriend, the Defendant, Robert Belt. While at the victim's home, they watched a basketball game, smoked marijuana, and drank alcohol. An hour or so later, the Defendant struck the victim in the head with a large, glass, Grey Goose bottle of alcohol. A struggle ensued between the Defendant and the victim, which led them from the living room to the kitchen. Once in the kitchen, the victim was stabbed in the neck with a screwdriver and bludgeoned to death by co-defendant Williams, who repeatedly struck the victim in the head with a hammer. As the victim lay dying on the floor, co-defendant Williams ransacked the victim's home and took a PlayStation 3 gaming system and a Samsung IPad tablet. Following an investigation, the Defendant was indicted for the above offenses.

Prior to trial, the Defendant filed a motion to suppress two guns, a brown purse, and mason jars containing a leafy substance, all of which were recovered from the room he was renting from his co-defendant's sister, Tyquisha Redmond. At the motion to suppress hearing, defense counsel conceded that a proper search warrant was issued; however, he claimed it was issued after the initial search of the Defendants' room. The proof adduced at the motion to suppress pertaining to this issue was as follows.[2] Officer Fausto Frias determined that the Defendant, co-defendant Jocelin Williams, and Shuntavia Louden were the last three people to have been seen with the victim before his death. He also determined (1) that the Defendant's fingerprints were found in the victim's home; (2) several items were missing from the victim's home including two handguns, an IPad tablet, and a PlayStation 3 game system; and (3) the make and model of the car used in the homicide. After a crime-stopper's tip, Officer Frias proceeded to 6935 Red Oak Circle, Apartment 28 (hereinafter the Redmond apartment), where the Defendant and co-defendant lived. Upon his arrival, Tyquisha Redmond met him at the door and advised him she was the one who had called the police. Redmond allowed him entry into the apartment, signed a consent to search her home, and directed him to where the PlayStation 3 game system was located. Officer Frias testified that Redmond gave him the PlayStation 3 game system, which had been in her bedroom where the Defendants put it. Officer Frias also searched Redmond's bedroom and other common areas of their home.

As defense counsel attempted to query further into the suppression of other evidence seized at the Redmond apartment, the State objected and argued "if we are going down the line of suppression . . . [the Defendant] has no standing at this point. So I am raising standing, formally. This is simply a probable cause issue here. If we are going to get to the search, I am going to ask that he establish standing on the record."

---

[2] The motion to suppress hearing, jointly conducted for the Defendant and co-defendant, Jocelin Williams, also challenged whether the Defendants arrests were supported by probable cause and whether their subsequent statements were voluntarily given. These issues are not raised on appeal.

Officer Frias continued and testified that Redmond advised him that the Defendants rented their room. Based on this information, Officer Frias did not search the Defendants' bedroom until after he obtained a search warrant. Contrary to Officer Frias's testimony, the Defendant testified that when the officers came to the Redmond apartment, they immediately searched the entire apartment, including his bedroom. The Defendant insisted that the officers did not have a search warrant at the time his room was searched. The Defendant denied telling officers that he did not live at the apartment, that he only slept there, and that anything found in the apartment did not belong to him. Finally, the Defendant attempted to testify based on a police report purported to provide that the evidence taken from his room was recovered at 11:47 that night, some seven minutes after the officers arrived and a full day before the search warrant was obtained. The trial court excluded the testimony as improper. After a thorough and extensive oral ruling accrediting the testimony of Officer Frias on this issue, the trial court denied the Defendant's motion to suppress.

**Trial.** Jimmie Blanchard, the victim's older brother, testified that he grew up with his brother, who was nicknamed, "Uno." Blanchard[3] identified two photographs of the victim, which were admitted into evidence. Blanchard recalled the last time he saw the victim was on a Friday night in April 2015. He said they had gone out to eat and had plans to see each other again later that night at a nightclub. When the victim did not show up as planned and failed to respond to phone calls, Blanchard became worried that something was wrong. Two days later, Blanchard entered the victim's apartment with the aid of the landlord and a police officer and found the victim's lifeless body. After the police investigation of the victim's home, Blanchard returned and discovered several items were missing. Blanchard identified the victim's PlayStation video game, which had unique "blue joysticks with Titan" markings. Both items were marked and later entered as exhibits at trial. He also identified a Samsung IPad tablet and two guns, a Taurus .357 Magnum revolver with live rounds and a Magnum .38 caliber special pistol, all of which belonged to the victim. Although Blanchard did not know the serial number of the guns, he identified them based upon their distinctive features including their "rusty-silver look" and the "snub-nose barrel." He confirmed that the victim sold marijuana, but he did not know how long he had done so. He also did not know whether the victim sold marijuana from his home.

Cortney McKinney, the victim's friend, testified and described the last time he saw the victim in April 2015. He was at the victim's home around ten in the evening watching a basketball game along with several other co-worker friends. He confirmed

---

[3] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Presiding Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. and Mrs. or by his or her proper title.

that he bought marijuana from the victim and had smoked it while at the victim's home. He said there were three other individuals he did not know who were also present that night, a male and two females. He said everyone seemed to be having a good time, and he and his co-worker friends left around eleven that night. The only other people who remained at the victim's home when they left were the three people he did not know. He identified photographs, exhibits 9 and 10, previously shown to him by the police as containing three different screenshots of the individuals who were at the victim's home that night. Exhibit 9 is a photograph of Louden, whom McKinney said he had previously seen at the victim's home. Exhibit 10 contained a photograph of the two other individuals. He denied that an argument between the victim and Louden occurred, and he explained that it was more of a "joke" or "misunderstanding." He also confirmed that Louden and the victim were "kind of dating."

Officer David Smith of the Memphis Police Department (MPD) crime scene investigation unit testified that he responded to a homicide investigation call on April 20, 2015, at 5346 Airview, Memphis, Tennessee. He identified several photographs taken of the outside of the victim's home, which showed there was no forced entry into his home. He also identified three diagrams of different angles of the interior of the victim's home. He further identified several photographs taken of the interior of the victim's home as well as physical evidence he recovered from the victim's home. Specifically, he identified a photograph of shattered glass from a liquor bottle in the living room on the couch and a photograph of the victim lying on the kitchen floor in a pool of blood with a tool box across his head. A mop was also recovered from the kitchen, the sponge portion of which was soaked in blood.

In April 2015, Tyquisha Redmond lived in the Germantown Falls apartment complex with her then-fiancé, now-husband, Damarco Carodine, and her sister, co-defendant Jocelin Williams, and the Defendant. Redmond was the leaseholder of the apartment and had lived there since December 2015. She said the Defendant and her sister had moved in late February 2015 and had been helping her to pay the bills. Although she did not know the victim personally, she "knew of him" because her brother bought marijuana from him. Prior to this offense, her sister, co-defendant Williams, called Redmond and asked to speak to her husband. Redmond said co-defendant Williams wanted to get a gun to "hit a lick," which meant to try and rob someone. Redmond did not provide her with a gun, and, to her knowledge, neither did her husband. After she learned of the victim's death, Redmond provided a statement to police in which she stated that co-defendant Williams "wanted to rob a dope dealer her friend, Shunta, was messing with." Redmond confirmed that her husband called the police to their home to retrieve items that were not in her home prior to the offense including (exhibits 6, 7, the PlayStation (Gameboy system)). She also identified the advice of rights form and a photographic array in which she identified the Defendant. She later found the IPad tablet

(exhibit 5) which did not belong to her in her laundry room, and she called the police to her home to recover it. She opened the tablet and saw photos of the victim.

Damarco Carodine testified consistently with the testimony of his wife, Tyquisha Redmond. He spoke with co-defendant Williams about a gun for a robbery "a couple of days" prior to when he called the police in this case. The same day he called the police, Carodine had a conversation with the Defendant about selling guns. Carodine testified that the Defendant asked him to sell some guns, and he agreed. Carodine testified that the Defendant told him that "he got [the guns] doing a robbery." Carodine nevertheless proceeded to help the Defendant sell the guns. During the drive to meet the buyer for the guns, the Defendant told Carodine of his involvement in the robbery. He said he hit the victim in the face with a glass bottle and that he stuck him in the head with a screwdriver. The Defendant attempted to clean up the scene by pouring water on the floor to get rid of the shoe prints. Carodine said the gun deal failed because the Defendant wanted "too much" money for the guns. Carodine spoke with his wife about the incident and called the police. He confirmed that the police eventually came to his home, he gave them permission to search, and they recovered two guns, a PlayStation 3, and some mason jars. The guns, mason jars, and other items were in the room where the Defendants stayed and were found in a suitcase. He said the PlayStation 3 was found under his bed, where he observed co-defendant Williams put it.

On cross-examination, Carodine admitted that he had initially called "528-CASH," and that he was paid $1000 as a result of his call to the police. He further agreed that after the police told him the items that were missing from the victim's home, he conducted a search of the Defendants' room and personal items. He also agreed that he did not include co-defendant Williams's inquiry about a gun in his statement to police. On redirect examination, he clarified that co-defendant Williams had asked him to place the PlayStation 3 underneath his bed the morning that he called the police. He also clarified that he did not learn of the details of the robbery until "on the way back from trying to sell" the guns.

Detective Fausto Frias of the MPD homicide unit testified that he was assigned to investigate the victim's death. By the time he arrived on the scene, the victim's home had been secured. During his investigation, he determined that several items were missing from the victim's home including a PlayStation 3, controllers to the gaming system, an IPad tablet, marijuana and money, and two guns. He eventually spoke with Cortney McKinney, who provided him with a social media photograph of Shuntavia Louden. In addition, based on a crime stoppers tip, he eventually spoke with Carodine. He then went to the Redmond apartment and recovered the missing items from the victim's home. He also recovered both Defendant Williams's and Belt's cellular phone, and approximately $302 from Belt.

Officer Marcus Mosby of the MPD crime scene investigation unit testified that he responded to a call to the Redmond apartment on April 25, 2015. He took various photographs while on the scene of items including a PlayStation 3, two blue remote controls, two tennis shoes, and a black suitcase opened to show a brown purse with a mason jar containing a green leafy substance. He testified that he recovered all the items and tagged them in the property room. The officer was unable to verify the owner of the guns; but he was able to determine that the guns had not been reported stolen. He tested the green leafy substance in the mason jars, which was positive for 37.3 grams of marijuana.

William Merritt, a criminal investigator with the District Attorney General's Office, obtained the IPad tablet from the property room and a search warrant for its content. He provided the tablet to Lieutenant Victoria Harris, an expert in cell phone and data forensics. He also attempted to locate Jack Graves and Casey Rigsby, two individuals who were with Courtney McKinney at the victim's home, but he was unsuccessful. Lieutenant Harris testified that she extracted personal identifying information from the IPad tablet, which was memorialized in a report and admitted as an exhibit at trial. She stated that the IPad tablet had an email account that belonged to Delvinbrown92@gmail.com.

Shuntavia Louden, who was charged with facilitation of first-degree murder and facilitation of especially aggravated robbery for her involvement in this case, testified that she and the victim had been in "sort of like in a relationship, but not like that" for a couple of months prior to the offense. She knew the victim sold drugs and carried a gun. She had known the co-defendant for her entire life and had just recently met the Defendant, Robert Belt. On or about April 17, the co-defendant called her and asked if the victim would sell her some marijuana. Louden told her yes. The Defendants went to Louden's home, picked her up, and drove to the victim's home. While they were at the victim's home, they began to watch a basketball game. Louden said three other individuals came to the victim's home, bought some marijuana, and eventually left. She testified that they were "just still talking, hanging out, smoking," when the Defendant got up and struck the victim in the head with a "big old Grey Goose bottle." Louden ran outside the house, but she returned for fear of retaliation.

She testified that the Defendant was "tussling" or wrestling with the victim on the couch while co-defendant Williams was "hitting him all up in his face." They stumbled into the kitchen and the victim was trying to get his gun, but he could not reach it. Co-defendant Williams asked Louden where the guns were located, and Louden said she did not know. While in the kitchen, the Defendant told co-defendant Williams to get the scissors, and she complied. Co-defendant Williams then "started sticking, multiple times, multiple times, multiple times." The Defendant then told co-defendant Williams to "get

- 6 -

the hammer." Co-defendant Williams "got the hammer, and all [the victim's] brains just started coming out, like, all of it. You could see everything. He was not responding. He wasn't moving at all." The Defendant picked up a mop and began to clean up while co-defendant Williams ran around the victim's home. Co-defendant Williams took the victim's PlayStation 3, a mason jar where the victim kept his marijuana, and his guns. She also tried to take the victim's television, but the Defendant told her not to because "it would look too obvious."

They left the victim's home and threw away their bloody clothes, the scissors, and the hammer. Louden asked the Defendants to take her home, but they refused and threatened to harm her sister. They went to a hotel, smoked marijuana, and split up the money. Louden received approximately $500, which she claimed the Defendant gave her to keep quiet. They stayed at the hotel until the next morning and then co-defendant Williams dropped off the Defendant at "some apartments . . . with the rest of the things" and then took her home. Louden did not tell her mother or call the police because she was afraid and wanted to get an attorney. A week or so after the offense, she turned herself in to the police. She denied "setting up" the victim or knowing that the Defendants intended to rob or kill the victim. She identified the Defendants at trial. Finally, she acknowledged that she was seven months pregnant at the time of trial, that her indictment for her involvement in this case was pending, and that she had not been promised anything in exchange for her testimony.

On cross-examination, Louden said that co-defendant Williams went into the hotel to rent the room, and she was unaware of whether co-defendant Williams used Louden's identification to do so. She acknowledged that the offense occurred on her birthday, and that, rather than being with her husband, she was with the Defendants at the victim's home. She clarified that she "used to date" the victim. She initially stated that she gave the $500 back to co-defendant Williams surreptitiously; however, she acknowledged omitting this information from her statement to police.

Charrel Gambill, a court reporter for the State of Tennessee, testified regarding the transcription of the hearing from the July 18, 2017 motion to suppress. Portions of the Defendant's testimony were read to the jury and admitted into evidence at trial. Specifically, the Defendant testified that the police found and took photos of items that were located "inside our room, inside of a closet, inside of a suitcase." Detective Robert Wilkie testified consistently with his testimony from the motion to suppress hearing. Sergeant Eric Kelly testified that he prepared the search warrant for the Redmond apartment, which led to the discovery of the victim's possessions. He also testified, consistently with his testimony from the motion to suppress hearing, that he took co-defendant Williams's statement. A redacted version of her statement was read to the jury and admitted as an exhibit at trial.

Dr. Kevin Jenkins testified as an expert in the field of forensic pathology. He explained that Dr. Karen Chancellor, the medical examiner who performed the autopsy of the victim, was ill; however, he had reviewed her entire file regarding the victim. Dr. Chancellor's records were properly qualified as business records and admitted into evidence as an exhibit. Several photographs taken during the autopsy illustrating the extent of the victim's injuries were also admitted into evidence as an exhibit. Dr. Jenkins testified that certain injuries on the victim's body were consistent with having been inflicted by scissors, a screwdriver, and a hammer. The toxicology report revealed the victim had 0.1 milligrams of alcohol, 36 nanograms per milliliter of marijuana, and 30 nanograms of oxycodone in his system. Dr. Jenkins testified that the cause of the victim's death was multiple blunt force injuries of the head and sharp force injuries of the head and neck. He stated that the manner of death was homicide.

The State rested its case. Following extensive questioning by counsel and the court, both Defendants elected to testify.[4] Defendant Belt, age 26, testified that in April 2015, co-defendant Williams was his girlfriend, and that, while he did not know Shuntavia Louden personally, he knew of her through co-defendant Williams. On the night of the offense, co-defendant Williams drove the Defendant and Louden to the victim's home. The Defendant testified that prior to that night he had not met Louden or the victim. He testified further that the purpose of taking Louden to the victim's home was to celebrate her birthday. He said they smoked marijuana and drank alcohol. He agreed that while at the victim's home, the victim and Louden began "checking each other." He claimed that it "[k]ind of, sort of, [got out of hand]" but it did not result in a fight. According to the Defendant, shortly after midnight, he and co-defendant Williams left the victim's home, went to their apartment, and did not return to the victim's home. Louden remained at the victim's home with the victim. The Defendant denied Louden's version of events and denied killing the victim. He said he had owned the PlayStation 3 and the guns for some time prior to the offense. He also denied having any conversation with Demarco Carodine regarding the sale of guns. The Defendant claimed that Louden gave co-defendant Williams the IPad, which she had had for two or three weeks prior to the offense, to do online employment applications. On cross-examination, the Defendant agreed that at the time of the offense he was unemployed and sold marijuana to make ends meet. He agreed that he had been advised of rights and had provided a statement to police following his arrest.

Co-defendant Williams, age 25, testified and confirmed, in large part, the testimony of Loudon. She also adopted the version of her statement previously testified to by Sergeant Kelly, with minor modifications. Co-defendant Williams agreed that she called Louden on the night of the offense, and they went to the victim's home, with the

<hr>

[4] The record reflects that a Momon hearing was conducted for both defendants.

intent to buy marijuana from him. She denied smoking marijuana that night; however, she conceded that they watched a basketball game while others smoked marijuana and drank alcohol. She said that Louden and the victim argued that night, but she did not know what it was about. She said, "out of nowhere," the victim said, "if somebody try to do something, he going (sic) blow they ass off." She explained that they did not have any weapons, but Defendant Belt then "hit [the victim] in the head with a bottle[.]" Although she did not see the victim with a gun, she believed he was "going for his gun" based on what Louden had told her. She then testified, "I'm sorry. I'm sorry. I had – I had hit—I had hit him in the head [with the hammer]." She further explained as follows:

> I'm sorry, y'all, but – it just happened so fast. I don't know how many times, 'cause I wasn't even counting. I can't say the force I put on there, but that's all that – that's all I did. I wasn't looking out for nobody else. I was just thinking about myself, because the way it had happened, like, for him to get hit, and tussling, and him having a gun, I mean, I was afraid for my life.

She denied going to the victim's home intending to rob him and asking Redmond for a gun prior to the offense. She denied stabbing the victim with scissors or a screwdriver or throwing a toolbox on his head. She confirmed that Defendant Belt tussled with the victim, during which Louden shouted that the victim had a gun. Although she denied taking the victim's money, she agreed that she took the victim's PlayStation 3 and the IPad as they were leaving his home. She said they left the victim's home, went to the Walmart, and then to the hotel. She disputed Louden's testimony regarding Louden's reluctance to go with them or to take a portion of the victim's money. She eventually returned to the Redmond apartment, where she stored the items taken from the victim's home. She said that she had smoked more than one blunt of marijuana prior to providing the statement to police.

The only part of co-defendant Williams's statement which she claimed was untrue concerned "the driving around part" and "the toolbox part." She explained that they did not buy the marijuana and leave that night, as she noted in her statement. She also denied handing Defendant Belt the toolbox to hit the victim in the head; but she insisted that she struck the victim with the hammer before the toolbox was thrown on the victim's head. She also stated that the hotel room was rented in Louden's name, contrary to her statement to police. She agreed that she omitted the "blow your ass off" statement she attributed to the victim from her statement to police. Although she did not see the victim with a gun, she believed he had one during his struggle with Defendant Belt. Co-defendant Williams insisted that she struck the victim in the head "on accident." Her original statement, without redaction, was admitted as an exhibit to her testimony at trial.

- 9 -

The Defendant was convicted as charged, and the trial court imposed an effective sentence of life plus twenty-five years' imprisonment. Following the denial of his motion for new trial, the Defendant filed a notice of appeal and is now properly before this court for review.

## ANALYSIS

**Motion to Suppress.** The Defendant argues that the trial court erred in failing to grant his motion to suppress two handguns, the brown purse, and mason jars of marijuana, all of which were seized from his room in the Redmond apartment. He does not challenge the veracity of the search warrant. Rather, he argues that the trial court failed to accredit his testimony that the officers searched his room prior to obtaining the search warrant. In response, the State contends, and we agree, that the trial court properly denied the motion to suppress.

Upon review of a trial court's denial of a motion to suppress, "'credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" State v. Pruitt, 510 S.W.3d 398, 408 (Tenn. 2016) (citing State v. Northern, 262 S.W.3d 741, 747 (Tenn. 2008) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996))). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" Id. (citing State v. Garcia, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001))). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" Id. (citing Northern, 262 S.W.3d at 748 (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn.1998))).

In ruling on this issue, the trial court reasoned as follows:

> And the proof that the Court has before it and I accredit, Officer Frias testimony was stated very clearly and almost indignantly when he was asked whether or not he searched the bedroom that was identified as the [D]efendant's room, before getting a search warrant and again his testimony was Ms. Redmond agreed to sign a consent to search of her home, of her room, all the common areas and pointed out a room that the [D]efendant and Ms. Williams shared, rented and that he got a search warrant for the [D]efendants room and they did not execute, or conduct a search of that room until after they had secured a search warrant signed by a Magistrate. And notwithstanding, [the Defendant] says they are not telling the truth, these folks are lying. I credit Officer Frias testimony and I

do find that those areas that he has no standing to contest the search of, he has no standing and those things that were found in Ms. Redmond's, Ms. Carodine's bedroom, common areas, has absolutely no standing to object to that and things that were found as a result of the lawful search warrant that was received, processed by a Judge. And I find that the search was not conducted until these officers had, in fact, acquired a lawful search warrant and [the Defendant] has a disagreement and says they're lying, they actually conducted a search before they got the search warrant. I rule against [the Defendant] and this instance and I credit the testimony of Officer Frias and will deny the motion to suppress any items that were found in a bedroom that [the Defendants] rents, or shares as a result of those items being found by a lawful, a lawful search warrant that was obtained and executed by the Memphis Police Department.

This issue hinges solely on the credibility of the witnesses at the suppression hearing, which is entrusted to the discretion of the trial court. Although the Defendant insists that the search of his room occurred after the search warrant, Officer Frias testified that the officers did not search the Defendant's room until after they had obtained the search warrant. The trial court accredited the testimony of Officer Frias, and the record supports the trial court's determination. We are compelled to note that, at oral argument on this issue, defense counsel urged this court to review the trial court's exclusion of the Defendant's testimony based on the police report as fundamentally unfair. We have thoroughly reviewed the record, and it does not reveal any such error. In any event, even assuming error, the Defendant is not entitled to relief. Redmond, the leaseholder of the apartment, called the police and, upon their arrival, gave them property she believed was connected to the victim's death, the PlayStation 3. She said the PlayStation 3 had been placed in her bedroom by the Defendants. She also later found the victim's IPad in her laundry, called the officers again, and gave the IPad to the police. Under these circumstances, the Defendant is not entitled to relief.

**Sufficiency of the Evidence.** The Defendant next argues generally that the evidence was insufficient to support his convictions of premeditated, first-degree murder and especially aggravated robbery. At oral argument, defense counsel conceded that if the trial court's denial of the motion to suppress was upheld by this court, then this issue would be moot. In other words, the Defendant agreed that the evidence, along with the two guns, the brown purse, and the mason jars, was sufficient to support his convictions. For the reasons that follow, we agree.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279

S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The Defendant was charged, alternatively, with first degree-murder and felony murder. In order to establish first-degree murder, the State was required to prove that the Defendant committed a premeditated and intentional killing of another. Tenn. Code Ann. §§ 39-13-202(1), (2). In order to sustain a conviction of felony murder, the State was required to establish that the Defendant killed the victim in the perpetration of or attempt to perpetrate any first-degree murder, . . . robbery, burglary, [or] theft[.]" The Defendant was also convicted of especially aggravated robbery which required the State to prove a robbery that was "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffer[ed] serious bodily injury." Tenn. Code Ann. § 39-13-403(a)(1), (2). Especially aggravated robbery requires proof of both elements: use of a deadly weapon and serious bodily injury to the victim. See Stewart v. State, 33 S.W.3d 785, 792 (Tenn. 2000). "Robbery" is the "intentional or knowing theft of property from the person of another by

violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010). "Bodily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (2010). "Serious bodily injury" is defined as "bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(34); State v. Farmer, 380 S.W.3d 96, 100-01 (Tenn. 2012).

Viewing the evidence in the light most favorable to the State, at some point prior to the victim's death, the Defendant, along with his girlfriend, co-defendant Williams, engaged in a plan to rob the victim, which ultimately led to the victim's death. Prior to the victim's death, co-defendant Williams told her sister, Redmond, she wanted to get a gun to "hit a lick," which meant to try and rob someone. After learning of the victim's death, Redmond provided a statement to police in which she stated that her sister, co-defendant Williams, specifically said that she "wanted to rob a dope dealer her friend, Shunta, was messing with." On the day of the offense, co-defendant Williams called Louden, the victim's girlfriend, and asked if the victim would sell her marijuana. Louden arranged to go to the victim's home along with co-defendant Williams and her boyfriend, Defendant Belt. Louden had not met the Defendant prior to co-defendant William's request to purchase drugs. After about an hour of watching television, smoking marijuana, and drinking alcohol, Defendant Belt struck the victim in the head with a large, glass, Grey Goose alcohol bottle. A struggle ensued, and eventually the Defendant and co-defendant Williams brutally killed the victim by bludgeoning him in the head with a hammer, stabbing him in the neck with a screwdriver, and throwing a toolbox on top of his head. Louden, an eyewitness to the killing, testified at trial and confirmed critical details of the offense, including how the Defendant struck the victim in the head and struggled with him.

Co-defendant Williams also testified at trial and denied the Defendant's version of events that night. Co-defendant Williams testified consistently with Louden concerning how the Defendant struck the victim in the head. While the Defendant continued to fight with the victim, co-defendant Williams ransacked the victim's home, and took a PlayStation 3 and an IPad. The victim's belongings, namely the guns and mason jars of marijuana, were found in the Redmond apartment, specifically in the room rented by the Defendant and co-defendant Williams. The PlayStation gaming system and the victim's IPad were also found in other areas of the apartment, and Redmond and Carodine said the Defendants brought them to the apartment. Co-defendant Williams testified at trial that she killed the victim, took his belongings, and shared the money that was taken from the

victim with the Defendant and Louden. There was overwhelming proof supporting the Defendant's convictions in this case. He is not entitled to relief.

**Consecutive Sentencing.** Lastly, the Defendant argues that the trial court abused its discretion in ordering his especially aggravated robbery sentence to be served consecutively to his life sentence for first-degree murder. He contends that because he does not have "an extensive criminal record[,]" and the court failed to "give any reasons why the [D]efendant is more dangerous than anyone else[,]" he should have been allowed to serve his sentences concurrently. The State argues, and we agree, that the trial court properly imposed consecutive sentencing.

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. Tenn. Code Ann. § 40-35-115(a). The Tennessee Supreme Court has held, "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in code section 40-35-115(b). Those categories include:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6) The defendant is sentenced for an offense committed while on probation; or
> (7) The defendant is sentenced for criminal contempt.

- 14 -

Tenn. Code Ann. § 40-35-115(b).

An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708. To adequately provide reasons on the record to support the imposition of consecutive sentences based on the dangerous offender classification, trial courts must also conclude that the evidence has established that the aggregate sentence is (1) reasonably related to the severity of the offenses; and (2) necessary to protect the public from further criminal acts. Id. at 863 (citing State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)).

Here, the record shows that the trial court imposed consecutive sentencing after determining that the Defendant was a dangerous offender. Tenn. Code Ann. § 40-35-115(b)(4). The relevant portions of its oral ruling are as follows:

[T]he State has asked the [c]ourt to consider whether or not the Defendant is a dangerous offender whose behavior indicates little or no regard for human life, who had no hesitation about committing an offense in which the risk to human life was high. And I do find that applies in this case.

. . . .

This [c]ourt also finds that confinement for an extended period of time is necessary to protect this community from [the Defendant's] . . . further possibility of committing crimes in this community.

. . . .

[T]he [c]ourt does find that, pursuant to State v. Wilkerson, . . . that the aggregate length of sentences in this case are reasonably related to the severity of the offenses for which [the Defendant] has been convicted, and that consecutive sentences are necessary to protect this community from further criminal acts . . . by this particular defendant.

. . . .

State v. Robinson, 930 S.W.2d 78 (Tenn. Crim. App. 1995), would indicate that the underlying principle behind consecutive sentencing is not whether the length of the sentence is logical based on the age of the

- 15 -

defendant at sentencing, but whether a defendant should escape the full impact of punishment for one of his offenses.

These are two separate crimes, and this [c]ourt is firmly of the opinion that [the Defendant] should be punished separately for each of these crimes that he, in fact, committed, and each of these crimes for which a jury has found him guilty.

Although the Defendant argues that the trial court improperly imposed consecutive sentencing based solely on the court's being "horrified by the physical facts of the homicide[,]" we conclude that the record adequately supports consecutive sentencing based on the Defendant's classification as a dangerous offender. Here, the Defendant argues that "the court does not give any reasons why the [D]efendant is more dangerous than anyone else" and fails to state "why society should be especially protected from this defendant as opposed to anyone else who commits a homicide." We disagree. The trial court described in detail the "horrific" injuries that the victim suffered after the Defendant attacked him in his own home. The trial court further noted, multiple times, that the Defendant had attacked the victim in his own home "without provocation," after spending time with the victim.

Although the Defendant argues that he does not have an extensive criminal record, the existence of only one of the seven enumerated categories is sufficient to impose consecutive sentencing. See Pollard, 423 S.W.3d at 862; Tenn. Code Ann. § 40-35-115(b). Because the trial court specifically applied the additional findings required by Wilkerson after finding the Defendant to be a dangerous offender, we conclude that the trial court determined that consecutive sentencing was reasonably related to the severity of the offenses and the need to protect the public from the Defendant's future criminal conduct. Accordingly, we conclude that the trial court properly imposed consecutive sentencing.

## CONCLUSION

Based on the above authority and analysis, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE