# THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 21, 2026 Session

## STATE OF TENNESSEE v. EVELYN D. KENNEDY and CHRISTOPHER L. KENNEDY

**Appeal from the Criminal Court for Roane County**
**Nos. 2019-CR-554A, 2019-CR-554B     Jeffery Hill Wicks, Judge**

———————————————————

**Nos. E2024-01903-CCA-R3-CD**
**E2024-01910-CCA-R3-CD**

———————————————————

The Defendants, Evelyn D. Kennedy[1] and Christoper L. Kennedy, bring this consolidated appeal from their convictions for first degree felony murder and aggravated neglect of an elderly or vulnerable adult resulting in serious bodily injury, a Class B felony. *See* T.C.A. §§ 39-13-202(a)(2) (2018) (subsequently amended) (felony murder), 39-15-508 (2025) (aggravated neglect of an elderly or vulnerable adult resulting in serious bodily injury). The trial court sentenced both Defendants to concurrent terms of life for their felony murder convictions and twelve years for their aggravated neglect convictions. On appeal, the Defendants contend that: (1) their convictions violate the *ex post facto* protections of the State and federal constitutions and (2) the trial court abused its discretion in admitting graphic autopsy photographs. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and STEVEN W. SWORD, JJ., joined.

Alan R. Moore, Kingston, Tennessee, for the appellant, Evelyn D. Kennedy.

Kim Nelson, District Public Defender; William W. Gill (on appeal), Assistant Public Defender – Appellate Division; Ethan L. DeVoe (on appeal), Qualified Law Student; Mart Cizek (at trial), Assistant Public Defender, for the appellant, Christopher L. Kennedy.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Robert Edwards, District Attorney General; and Jonathan Edwards, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The trial evidence showed that Defendant Evelyn D. Kennedy was known as "Denise." We have referred to her in this opinion as "Evelyn" to conform with the indictment.

# OPINION

The Defendants were the caregivers for seventy-two-year-old Betty Crews, who was found malnourished and living in deplorable conditions in the Defendants' home after another family member called for an ambulance upon finding the victim in apparent need of medical care. The victim was Defendant Evelyn Kennedy's aunt and lived in the basement of the Defendants' home. In addition to the Defendants and the victim, several other family members lived in the Defendants' home during the indictment period. The victim was transported by ambulance from the Defendants' home to a hospital on April 5, 2019, and she was diagnosed with hypovolemic shock, acute encephalopathy, and bacteremia resulting from bedsores. She was severely malnourished, and her kidneys were failing. The victim remained hospitalized for two months and eventually died on June 7, 2019.

At the trial, the State presented evidence that the elderly victim lived in the Defendants' basement in unsanitary and austere conditions. Both Defendants were her caregivers, although Defendant Evelyn Kennedy worked both a fulltime and a parttime job, and Defendant Christopher Kennedy had a greater caregiving role with the victim.

Paramedics who responded to the home on April 5, 2019, in response to a call about a person with "altered mental status" and "generalized weakness," testified as follows: One paramedic said the victim was in a room in the basement that "locked from the outside," although he did not recall if it was locked when Defendant Evelyn Kennedy opened the door for him. He said that the victim lay on a bed, which had no sheets, and that she wore a soiled polo shirt but no pants, underwear, or adult diaper. She was not communicative. The floor was covered in feces and urine and smelled of vomit. The room appeared not to have been cleaned in a while. The other paramedic administered stabilizing treatment, including ventilation with a bag valve mask to assist the victim's breathing, before transporting her to a hospital. The paramedics first thought the victim was dead. The paramedics said she was very skinny, extremely malnourished and dehydrated, had bedsores, and her skin was soiled with what appeared to be feces. One of the paramedics said a surgical screw protruded through her skin on her right leg. One of the paramedics said Defendant Evelyn Kennedy told him that the victim had been "completely normal the day before" and argued with him about whether the victim was malnourished.

Defendant Denise Kennedy's daughter testified that she, her husband, and their children lived in the basement of the Defendants' home from March 2017 until February 2018. She said that the victim lived in another room in the basement, which the Defendants kept locked with padlocks. She said the Defendants also kept a door between the basement

and the main level of the house padlocked. She said the basement was moldy and infested with roaches. Defendant Denise Kennedy's daughter said Defendant Denise Kennedy forbade her from talking to the victim, "mess[ing] with the doors," and feeding the victim. Defendant Denise Kennedy's daughter said that, because the plumbing in the basement did not work properly, the victim had a bucket in her room for toileting. Defendant Denise Kennedy's daughter said the Defendants brought the victim a package of hot dogs about once a week but did not provide her with hydration or other food. Defendant Denise Kennedy's daughter sometimes surreptitiously gave food to the victim. Defendant Denise Kennedy's daughter said that she and her husband prepared Thanksgiving dinner in 2017 and "snuck [the victim] out" while the Defendants were away but that Defendant Christopher Kennedy came home, beat the victim, locked her in the basement room, and turned off the electricity to the basement. Defendant Denise Kennedy's daughter said she "reported to D.C.S. multiple times" but had not known about Adult Protective Services at the time. She said that "D.C.S." came to the home six or seven times to investigate but that the Defendants told the investigators that the room in which the victim was locked was for storage or dogs.

The Defendants gave pretrial statements, in which they claimed to have fed the victim multiple meals daily before her removal from the home on April 5, 2019. They said the victim's health had only declined in the past couple of weeks. Defendant Evelyn Kennedy said she had spoken to someone recently about having the victim moved to a residential placement. Defendant Christopher Kennedy said he diapered the victim and cleaned her with wet wipes when changing her diapers. He said he bathed the victim every two to three days. He said the victim had begun eating less in the last week to week and one-half before April 5, 2019. He said the victim had lost weight but that he thought it was due to old age. He said Defendant Evelyn Kennedy had planned to take the victim "to the hospital to get her checked out" when Defendant Evelyn Kennedy arrived home from work on April 5, but that his stepdaughter called 9-1-1 after she found the victim non-responsive.

The medical evidence showed that, when the victim arrived at the hospital on April 5, 2019, she was in shock and was experiencing respiratory and kidney failures. The hospital staff did not think the victim would survive overnight. She had several decubitus ulcers, or bedsores, on her back side. Her big toenails had overgrown in a curved manner and pressed into the bottom of her toes. The victim was 5'7" and weighed 75 to 77 pounds when admitted. A physician hospitalist who treated the victim opined that, based upon her observations and clinical findings, the victim's health had been deteriorating over a period of time and that the victim's condition had not suddenly declined. Three physician hospitalists who treated the victim testified about the victim's severe malnutrition and the futility of continuing life-sustaining care. They testified about their respective conversations with Defendant Evelyn Kennedy, the victim's decision-maker, in which they advised her of the victim's grave condition and the futility of further life-sustaining care.

They said Defendant Evelyn Kennedy was indecisive in these conversations about the victim's continuing care and about when she would be able to decide. One hospitalist said that, after the victim had been in the intensive care unit for about three weeks, Defendant Evelyn Kennedy agreed to transition the victim to "comfort care" and have the ventilator removed within a few days but that, the following week, she wanted to have the victim sent to a specialty hospital for further care. The hospitalist said that, at this point, he advised Defendant Evelyn Kennedy that further treatment "would serve more to torture this poor lady rather than provide any benefit." After the victim had been hospitalized for about one month, Defendant Evelyn Kennedy advised one of the hospitalists that, on the advice of her attorney, she should not discuss withdrawing the victim's medical care and that she was concerned about being charged criminally if the victim died.

The medical examiner who testified at the trial opined that the manner of the victim's death was homicide and that the cause was starvation and dehydration. The medical examiner opined that, although the victim had some underlying medical conditions, she would have been able to continue living a healthy life if she had received "proper nutrition and proper attention." The medical examiner also testified that, by the time the victim was taken to the hospital, her death was inevitable due to the extent of her then-existing physical deterioration.

Over defense objection, photographs depicting the victim's physical condition after she arrived at the hospital and at the time of the autopsy were received as exhibits. The hospital photographs depicted the victim's emaciated condition, her overgrown toenails, and the ulcers on her hip and above her tailbone.

The autopsy photographs depicted the victim's right foot and toes, and front and back views of her torso and upper legs. The medical examiner testified that the victim's toes were "essentially dead" and "almost mummified" and that they would have required amputation if the victim had lived. The medical examiner said the toes were blackened due to lack of circulation. The medical examiner said that photographs depicting the condition of the victim's feet taken around the time of hospital admission showed that the "vicious cycle of tissue necrosis" was already underway and that "it was already too late to do anything."

Additional photographs depicted the front and back view of the unclothed victim. From these photographs, the medical examiner testified about the victim's emaciation and tissue breakdown. The medical examiner contrasted the victim's appearance in a previously admitted photograph taken around the time of her hospital admission and stated that the victim showed some volume gain in the autopsy photographs due to the two months she spent on a feeding tube during the hospitalization. The medical examiner testified that the photographs also showed the ulcers on the victim's buttocks, side hip area, and tailbone

- 4 -

area. A closeup photograph of the large tailbone-area ulcer was also admitted. The medical examiner said the largest ulcer over the tailbone area showed evidence that a large area of necrotic tissue had been surgically debrided and also showed evidence that the area had begun to heal. She said the surgical intervention would have made the area look larger. The medical examiner said the victim would have required skin transplant surgery in this area if she had lived.

The medical examiner reviewed the victim's medical records and testified that, based upon the victim's initial laboratory results on admission, "it's miraculous that actually [the victim] even lived." The medical examiner opined that the victim suffered from greater emaciation, malnutrition, and dehydration than would be expected if the victim had been deprived of hydration and nutrition for two weeks. The medical examiner said that the victim's bones, as shown in x-ray exhibits, corroborated this finding and supported the conclusion that the victim had not received adequate food and hydration for at least two months and possibly longer.

Two of the Defendants' children gave defense testimony that was contradictory as to some of Defendant Evelyn Kennedy's daughter's testimony, such as whether the basement bathroom was functional, whether Defendant Christopher Kennedy ever physically assaulted the victim, and whether the Defendants and other family members provided food regularly to the victim.

Defendant Christopher Kennedy testified that he fed and cared for the victim's hygiene needs, including applying medication to the bedsores and changing her adult diapers, after she became unable to take care of her own meals, toileting, and hygiene in the last week and one-half to two weeks before she went to the hospital on April 5, 2019. He said the victim was able to cook for herself in a kitchen in the basement and that he cooked meals for her after she was no longer mobile, even with the assistance of a walker, in the last two weeks. He said that one of his daughters helped the victim with showers because the victim did not want him to see her naked but that he eventually gave the victim sponge baths once she was unable to shower. He denied ever hitting the victim. He said the victim did not see a primary care physician regularly and that he and Defendant Evelyn Kennedy had been trying to make an appointment for the victim at a medical practice in Kingston.

Defendant Evelyn Kennedy testified that she made medical appointments for the victim, which the victim did not keep. She said the victim began eating less about two weeks before April 5, 2019. Defendant Evelyn Kennedy said that, around this time, the victim did not want to get out of bed. Defendant Evelyn Kennedy said she had contacted nursing homes looking for a placement for the victim. Defendant Evelyn Kennedy said she and Defendant Christopher Kennedy fed the victim and never deprived her of food.

She denied striking the victim or locking the victim in the victim's bedroom. She said Defendant Christopher Kennedy provided a significant portion of the victim's care because Defendant Evelyn Kennedy was away at work. Defendant Evelyn Kennedy said she bought medication for the victim's ulcers because Defendant Christopher Kennedy told her to get it. Defendant Evelyn Kennedy said she did not inspect the ulcers. Defendant Evelyn Kennedy said that one of her daughters had stayed overnight on April 4, 2019, and was at the home on April 5 to help with the victim. Defendant Evelyn Kennedy denied telling hospital personnel that she had spoken to an attorney and had been advised that hospital personnel could not force her to change the victim's care plan.

A defense medical expert, who was a psychiatrist, testified that he had reviewed the victim's medical records and other documents relevant to the case. He opined that the victim's health had deteriorated as a result of many years of living an "unhealthy lifestyle." In his opinion, the victim had begun developing encephalopathy, or brain dysfunction, about two months before April 5, 2019, which was imperceptible to her family. He opined that her having stopped smoking and having greatly decreased her food intake in the two weeks before April 5, 2019, were due to worsening encephalopathy, which had become acute. He said that, often, patients' family members do not understand the signs of the illness. He acknowledged that dehydration and malnutrition could result in encephalopathy and kidney failure.

The defense medical expert testified that the victim's curled big toenails had probably grown this way for around twenty years and that this type of toenail growth was not unusual in psychiatric and elderly populations if they were not seen by a podiatrist. He said patients with encephalopathy often urinated, defecated and vomited on themselves and that they sometimes removed their clothing or bedding. He opined that she had suffered several microscopic strokes which resulted in brain shrinkage. He said the victim suffered from vascular disease, which led to decreased circulation and damage to her toes and heart, in addition to her brain.

The State recalled the medical examiner, who testified that she disagreed with the defense expert's opinion that the victim had suffered microscopic strokes and that the tissue death in her toes was attributable to severe hypertension and decreased circulation due to malnutrition and dehydration. The medical examiner opined that, contrary to the defense expert's testimony, the victim's encephalopathy and "multiple system failure" were caused by malnutrition and dehydration. She disagreed that the victim had suffered brain shrinkage and said that brain swelling was present at the time of the autopsy.

On surrebuttal, the defense psychiatric expert opined that the victim's history of smoking contributed to her vascular disease, which "began long ago."

- 6 -

After receiving the proof, the jury found the Defendants guilty of the charged offenses of first degree felony murder based upon aggravated neglect of an elderly adult and aggravated neglect of an elderly or vulnerable adult resulting in serious bodily injury. They each received effective life sentences. This appeal followed.

# I

## Constitutionality of Convictions

The Defendants challenge their respective convictions as unconstitutional on the basis that the convictions violate *ex post facto* prohibitions. They argue that the relevant statutes for felony murder and aggravated neglect of an elderly or vulnerable adult were amended during the time period alleged in the indictment and that the amendments made the offenses greater, altered the nature of the offenses, and increased the punishment. They argue that the trial court erred in concluding that the offenses were continuing in nature and therefore not violative of *ex post facto* prohibitions. They ask this court to reverse the convictions and dismiss the charges. The State responds that no violation of *ex post facto* prohibitions occurred because aggravated neglect of an elderly or vulnerable adult is a continuing offense and was not consummated in this case until after the effective date of the relevant amendments. We conclude that no violation of *ex post facto* prohibitions occurred.

An understanding of the time period covered by the indictment and the effective dates of the relevant statutes is pertinent here. The indictment charged the Defendants with committing the offenses "on or about March 1, 2017 to April 5, 2019." The victim was taken by emergency responders to the hospital on April 5, 2019, and she died on June 7, 2019, without ever returning to the Defendants' care.

During the time alleged in the indictment, both the statutes pertaining to elder neglect and first degree felony murder were amended. In the case of elder neglect, the relevant statute on March 1, 2017, was Code section 71-6-119, which proscribed "knowingly, other than by accidental means, physically abus[ing] or grossly neglect[ing] an impaired adult if the abuse or neglect results in serious mental or physical harm." *See* T.C.A. § 71-6-119(a) (2018) (amended 2019 & repealed eff. Jan. 1, 2020) (titled "Knowing physical abuse or gross neglect of an impaired adult"). This offense was classified as a Class C felony. *Id.* at (c).

In 2018, the legislature enacted the Elderly and Vulnerable Adult Protection Act of 2018, which became effective January 1, 2019. The Act did three things that are relevant here. First, it amended Code section 71-6-119, eliminating the references to neglect and gross neglect. *See id.* § 71-6-119(a) (2019) (subsequently repealed) (retitled "Physical

- 7 -

abuse—Elements of offense—Penalties"). Second, it enacted Code section 39-15-508, which defines the offense of aggravated neglect of an elderly or vulnerable adult, effective January 1, 2019. *See id*. § 39-15-508 (2025). This statute proscribes neglect of an elderly or vulnerable adult resulting in, as relevant here, serious bodily injury. *See id.* at (a)(2). The Act provided, "Neglect can be the result of repeated conduct or a single incident." *See id.* § 39-15-501(7)(B) (2018) (eff. Jan. 1, 2019) (subsequently amended). This offense was designated a Class B felony. *See id.* at (d). Third, effective January 1, 2019, the Act amended the first degree felony murder statute to include Code sections 71-6-119 (physical abuse of an impaired adult) and 39-15-508 (aggravated neglect of an elderly or vulnerable adult) as predicate felonies for felony murder. *See id.* § 39-13-202(a)(2) (2018) (subsequently amended). Until that date, the felony murder statute had not listed Code section 71-6-119 as a predicate felony for felony murder, and section 39-15-508 did not exist. *See generally id.*

Thus, for approximately twenty-one months of the approximate twenty-five-month period covered by the indictment, the felony murder statute did not list any crime specifically related to the neglect of an elderly person as a predicate felony for felony murder. The crux of the Defendants' *ex post facto* challenge is that they were prosecuted for conduct which occurred before the effective date of the felony murder statutory amendments, which added the predicate felony with which they were charged: aggravated neglect of an elderly or vulnerable adult.

The United States and Tennessee Constitutions prohibit *ex post facto* laws. *See* U.S. Const. Art. 1, §§ 9, 10; Tenn. Const. art. 1, § 11. An *ex post facto* law is one which is "retrospective—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it, . . . by altering the definition of criminal conduct or increase the punishment for the crime[.]" *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (internal quotations omitted); *State v. Pruitt*, 510 S.W.3d 398, 416-17 (Tenn. 2016). The Tennessee Supreme Court has said that the respective Federal and State provisions are coextensive in their protections from the punitive effects of retrospective application of a statute. *See Pruitt*, 510 S.W.3d at 416. In *Calder v. Bull*, the United States Supreme Court defined four types of laws that constitute *ex post facto* laws:

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

3 U.S. 386, 390 (1798); *see Pruitt*, 510 S.W.3d at 411. Questions of constitutional interpretation are questions of law and are, therefore, subject to de novo review without a presumption of correctness afforded to the lower court's legal conclusions. *State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014).

The Defendants argue that this prosecution, based upon the statutory amendments that took effect in January 2019, fell into three of the four *Calder* categories: the amendments made the crimes greater than when they were committed, altered the nature of the offenses, and increased the punishment. Thus, the Defendants argue, the State was barred from prosecuting them for aggravated neglect of an elderly or vulnerable adult and felony murder predicated upon aggravated neglect of an elderly or vulnerable adult unless an exception to the *ex post facto* prohibition existed.

The State acknowledges that, upon enactment, the aggravated neglect of an elderly or vulnerable adult statute "aggravated" the offense formerly defined by Code section 71-6-119, "made [the offense] greater than it was," and imposed a greater punishment than previously had been in place. However, the State argues that continuing offenses are exempt from the *Calder* categorization and that aggravated neglect is a continuing offense. *See Agee v. State*, 111 S.W.3d 571, 577 (Tenn. Crim. App. 2003). The Defendants disagree, pointing to Code section 39-15-501, which states that aggravated neglect "can be the result of repeated conduct or a single incident." Because the offense may result from a "single incident," the Defendants reason, the trial court erred in concluding that it was a continuing offense. The Defendants argue that whether a crime is a continuing offense must be answered by analysis of the offense's statutory elements, rather than the language of the indictment or the facts of the case.

The time period of neglect alleged in the indictment straddles the enactment date of the aggravated neglect of an elderly or vulnerable adult statute. Another panel of this court has said that such an offense, which straddles a criminal statute's effective date, does not violate the *ex post facto* prohibition unless a jury could convict the defendant solely on the preenactment conduct. *Jeffrey Wayne Hughes v. State*, No. M2020-00531-CCA-R3-PC, 2021 WL 4316842, at *7 (Tenn. Crim. App. Sept. 23, 2021), *perm. app. denied* (Tenn. Feb. 10, 2022). The rationale is that "the offense is not completed until the last act is performed." *Id.* Notably, *Jeffrey Wayne Hughes* involved theft convictions. *Id.* at *1. Thus, the court focused on when the last act was performed because theft is a crime which is complete when a defendant takes the property. *See id.* at *7; *see also State v. Gentry*, 538 S.W.3d 413, 423 (Tenn. 2017) (holding that a theft is complete when a person takes property without consent and with the intent to deprive the owner of the property).

In the context of continuing crimes straddling the effective date of sentencing guidelines, federal courts have said that the crime is consummated upon its completion and, because the completion of a straddling crime necessarily occurs after the enactment of the sentencing guidelines law, no *ex post facto* issue arises. *See, e.g.*, *United States v. Wijegoonaratna*, 922 F.3d 983, 992-93 (9th Cir. 2019); *United States v. Josephberg*, 562 F.3d 478, 502 (2d Cir. 2009); *United States v. McCall*, 915 F.2d 811, 816 (2d Cir. 1990).

Aggravated neglect of an elderly or vulnerable adult occurs when a defendant neglects a victim, and such neglect results in serious physical harm or serious bodily injury. T.C.A. § 39-15-508(a)(1), (2). The statute provides the following definition of neglect:

> (7)(A) "Neglect" means:
>
> (i) The failure of a caregiver to provide the care, supervision, or services necessary to maintain the physical health of an elderly or vulnerable adult, including, but not limited to, the provision of food, water, clothing, medicine, shelter, medical services, a medical treatment plan prescribed by a healthcare professional, basic hygiene, or supervision that a reasonable person would consider essential for the well-being of an elderly or vulnerable adult;
>
> (ii) The failure of a caregiver to make a reasonable effort to protect an elderly or vulnerable adult from neglect or financial exploitation by others;
>
> (iii) Abandonment; or
>
> (iv) Confinement; and
>
> (B) Neglect can be the result of repeated conduct or a single incident[.]

T.C.A. § 39-15-501(7)(A), (B) (2018) (eff. Jan. 1, 2019) (subsequently amended).

Historically, our supreme court has considered neglect to be an ongoing offense. *See State v. Adams*, 24 S.W.3d 289, 295-96 (Tenn. 2000). In *Adams*, the defendants were convicted of aggravated child abuse through neglect. *Id.* at 290-91. On appeal, they argued that they had been deprived of juror unanimity because the trial court failed to require the State to elect the facts constituting the act of neglect upon which the State relied to support

the charge. *Id*. at 291. Resolving this appellate issue required determination of whether neglect was a discrete event, therefore requiring an election, or a continuing one, thus not requiring an election. The supreme court said that, first, it must "look to the statutory elements of the offense and determine whether the elements of the crime themselves contemplate punishment of a continuing course of conduct." *Id.* at 295 (*citing State v. Legg*, 9 S.W.3d 111, 116 (Tenn. 1999)). Upon doing so, the court noted that the term "neglect," an element of the offense, was not defined in the child abuse statutes or elsewhere in the criminal code. *See Adams*, 24 S.W.3d at 295. The court looked to other definitions of neglect in the Code: the term "dependent and neglected child" as contemplated by sections 37-1-102 and 37-5-103, and the term "abuse or neglect" as contemplated by section 71-6-102.[2] *See id.* In evaluating the former Adult Protection Act, the court stated,

> Neglect . . . does not end immediately upon the initial deprivation of health or welfare services by a caretaker, nor does it end upon the first minute that a person covered by the Act is placed in a situation where he or she is unable to obtain such services. Rather, the neglect continues until such services are provided or until the person is in a position to obtain such services on their own.

*Id.* at 296. The court held, "Analysis of these other definitions of 'neglect' clearly demonstrates that the General Assembly considers the act of neglect to be a continuing course of conduct[.]" *Id.*

After the *Adams* decision, the legislature enacted the Elderly and Vulnerable Adult Protection Act, which contained a definition of neglect which provided that "[n]eglect can be the result of repeated conduct or a single incident." *See* T.C.A. § 39-15-501(7)(B). The Defendants interpret the statute's "single incident" language to mean that neglect is no longer exclusively a continuing offense.

Aggravated neglect of an elderly or vulnerable adult has two elements: (1) willful and knowing neglect of a victim by a caregiver and (2) serious physical harm or serious bodily injury resulting from the neglect. *See id*. § 39-15-508(a)(1), (2). The neglect element is, by its nature, ongoing. *See Adams*, 24 S.W.3d at 296. The caregiver's act which resulted in neglect may be a single act, as in abandonment of the victim, although the element of neglect would be ongoing until the victim received necessary care. *See* T.C.A. § 39-15-501(7)(A)(iii). Thus, in the language of the statute, the neglect may result

---

[2] Code section 71-6-102 contained the definitions which applied to the former adult neglect statute, T.C.A. § 71-6-119(a), which was the predecessor statute to the aggravated neglect statute at issue in this case.

from a "single incident." *See id.* at (7)(B). Alternatively, neglect may result from "repeated conduct," as in a failure to provide the victim with proper nutrition for many meals and failure to seek medical care for the victim when malnutrition results. *See id.* at (7)(A)(i), (B). Whether the caregiver engages in one or multiple actions resulting in neglect, the neglect element is ongoing until the situation is remedied. *See Adams*, 24 S.W.3d at 296. Thus, we hold that aggravated neglect remains a continuing offense, notwithstanding the legislature's enactment of Code section 39-13-501(7)(B).

The Defendants argue that *State v. Young*, 904 S.W2d 603 (Tenn. Crim. App. 1995), compels a conclusion that a defendant cannot be charged for criminal conduct which occurred before a statute's enactment. In *Young*, the defendant fraudulently induced the elderly victim to write almost 400 checks over a period of almost three-and-one-half years. *Young*, 904 S.W.2d at 604. The defendant's conduct straddled the 1989 revisions to the Criminal Code. *Id.* The defendant was charged with two criminal counts related to his obtaining money by false pretense, one occurring before the effective date of the 1989 Code, and one occurring after the 1989 Code's effective date. *Id.* The pre-1989 Code charge was under section 39-3-901 (1982) (subsequently repealed), the false pretense statute. The 1989 Code charge was under section 39-14-103 (1989) (subsequently amended), the general theft statute. *Id.* at 604-05. The 1989 Code consolidated various theft-related crimes, including false pretense, into a general theft statute. *See id.* at 606; *see also* T.C.A. § 39-14-101 (2025) ("Conduct denominated as theft in this part constitutes a single offense embracing the separate offenses referenced before 1989 as embezzlement, false pretense, fraudulent conversion, larceny, receiving or concealing stolen property, and other similar offenses."). The defendant moved the trial court to consolidate the charges on the basis that they were multiplicitous, and the trial court ordered the State to amend the indictment to consolidate the offenses because they were part of a continuing crime. *Id.* at 605. On the State's appeal, this court held that, although the offenses were part of a continuing crime as defined by *Nelson v. State*, 344 S.W.2d 540, 542 (Tenn. 1960), and normally would be charged in a single count, the change in the law required that they be charged separately. *Id.* at 606-07. The *Young* court noted that, although the two statutes prohibited the same conduct, they had different elements. *Id.* at 606. The court also noted that the test announced in *Blockburger v. United States*, 284 U.S. 299, 302-03 (1932), would normally prohibit a conviction of both crimes because a person could not commit a false pretense crime without also committing a theft, but it held that *Blockburger* did not apply to the present case because the crimes with which the defendant was charged did not exist at the same time. *Young*, 904 S.W.2d at 606-07. Finally, the court looked to specific provisions of the 1989 Code which provided for prosecution of offenders who committed crimes before a law was amended or repealed to be prosecuted under the prior law as it existed at the time of the offense and for offenders who committed crimes after the enactment of a new law to be prosecuted under the new law. *See id.* at 607; *see also* T.C.A. §§ 39-11-112 (2025), 40-35-117(a), (b) (2025) ("All persons who commit crimes on or

- 12 -

after November 1, 1989, shall be tried and sentenced under this chapter[, and u]nless prohibited by the United States or Tennessee constitutions, any person sentenced on or after November 1, 1989, for an offense committed between July 1, 1982, and November 1, 1989, shall be sentenced under this chapter."). The court held that the defendant could be prosecuted for both false pretense under pre-1989 law and for theft under the 1989 Code, even though both crimes arose from a continuing course of conduct. *Id.* at 607. The court reasoned that, although the defendant's conduct constituted a continuing crime, "the only way to punish the conduct occurring both before and after the date of the statutory revisions . . . is to charge the [d]efendant with both crimes." *Id.*

In *Agee*, a later post-conviction case, the petitioner had pleaded guilty to conspiracy to distribute marijuana from August 1997 through December 1999.[3] *Agee*, 111 S.W.3d at 572. During the petitioner's ongoing conspiracy, the legislature amended the statute to increase the offense from a Class B to Class A felony. *Id.* The petitioner alleged in his post-conviction case that he had received the ineffective assistance of counsel and that his guilty plea had not been knowing and voluntary due to the advice he received from counsel about the range of punishment. *Id.* This court defined the relevant inquiry as one of when the offense occurred, which, in the case of conspiracy, was "'when the objectives of the conspiracy are completed.'" *Id.* at 577 (quoting T.C.A. § 39-12-103(e)(1)). Because conspiracy was characterized by its continuing course of conduct and, just as in the case under consideration, was completed after the statutory amendment increasing the punishment, no *ex post facto* violation occurred when the petitioner was sentenced under the amended statute as a Class A felony. *Id.* at 577. Notably, our supreme court recommended that this court's *Agee* opinion be published. *See Ronald Troy Agee v. State*, No. M2001-02420-SC-R11-PC (Tenn. Apr. 28, 2003) (order denying Rule 11 application and recommending publication of the opinion of the Court of Criminal Appeals pursuant to Tenn. Sup. Ct. R. 4(D)).

In *Young*, the defendant committed a series of criminal acts by obtaining money by false pretenses, with his conduct occurring both before and after the 1989 Code took effect. The legislature provided in the 1989 Criminal Code that prosecution of criminal acts occurring before the 1989 Code's effective date should be prosecuted under prior law and for criminal acts occurring after the 1989 Code's effective date should be prosecuted under the 1989 Code. *See* T.C.A. §§ 39-11-112, -117. Thus, two charges – false pretense and theft – were appropriate. As we noted above, theft is a crime which is complete upon the taking of property. *See Gentry*, 538 S.W.3d at 423. Likewise, the former offense of false pretense was completed when a person obtained "personal property, services, labor, or the signature of any person to any written instrument" by employing false pretense or any false

---

[3] The defendant pleaded guilty to a second drug offense that is not relevant for purposes of the present case. *See Agee*, 111 S.W.3d at 572.

- 13 -

token or counterfeit letter, with intent to defraud another. T.C.A. § 39-3-901 (repealed 1989). Like theft, false pretense was a crime which was completed when the defendant obtained one of the things delineated in the statute. Thus, the crimes charged in *Young* could be viewed as two separate series of criminal acts, which were consolidated as two separate ongoing schemes for purposes of charging criminal activity.

In the present case, the act of elder neglect could not be consummated under Code section 71-6-106, the previous statute, "until such [health and welfare] services are provided or until the person is in a position to obtain such services on their own." *See Adams*, 24 S.W.3d at 296. Thus, the Defendants' conduct was not divisible into two distinct, chargeable offenses, in contrast to *Young*. To the extent that the Defendants may have engaged in actions that would have resulted in a chargeable violation of Code section 71-6-119 if the neglect had terminated before the effective date of the Elderly and Vulnerable Adults Protection Act, that offense was never consummated before the Act took effect. *See Adams*, 24 S.W.3d at 296; *see also Weaver v. Graham*, 450 U.S. 24, 31 (1981) ("The critical question [in determining whether a law is *ex post facto* as applied to a defendant] is whether the law changes the legal consequences of acts completed before its effective date."), *abrogated in part by California Dept. of Corr. v. Morales*, 514 U.S. 499 (1995).

The State prosecuted the Defendants for continuing neglect which began before Code section 39-15-508 became effective and which continued for months after the statute's effective date, until it was consummated when the victim began receiving necessary care when she was taken to the hospital. Because aggravated neglect is a continuing crime until it is consummated by termination of the ongoing neglect, the Defendants' neglect of the victim extended for months past the effective date of Code section 39-15-508. The Defendants were not in peril of punishment based solely upon pre-indictment conduct. *See Jeffrey Wayne Hughes*, 2021 WL 4316842, at *7. We hold that no *ex post facto* violation occurred.

The Defendants are not entitled to relief on this basis.

## II

### Admission of Photograph Evidence

The Defendants contend that the trial court abused its discretion in admitting five autopsy photographs. They argue that the photographs had minimal probative value, given the existence of other photographs of the victim's condition shortly after her hospital admission and of extensive medical testimony at the trial, and that any probative value was

substantially outweighed by their prejudicial effect. The State responds that the court did not abuse its discretion.

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). When determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id*. at 951. Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

The trial court conducted a pretrial hearing on the admissibility of the photographs of the victim taken shortly after her hospital admission and, later, during the autopsy. The Defendant's appellate issue pertains only to the autopsy photographs. At the hearing, the defense maintained that the autopsy photographs lacked relevance because they were taken two months after the victim's initial hospital admission and that any probative value was substantially outweighed by the unfair prejudice that would result from their admission. The State called the medical examiner to testify about the photographs and their purported relevance to the case. The court reviewed twenty-five photographs, including the five autopsy photographs later admitted as some of the State's trial exhibits. The court found, based upon its review of the photographs and the medical examiner's testimony, that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice to the Defendant. Thus, the court ruled that the photographs would be admissible at the trial.

We have reviewed the five autopsy photographs, which are printed in color. Two depict the victim's right foot and toes, and they show the essentially mummified state of the toes. A third photograph depicts the victim's front side from the neck to above the knees. The victim is unclothed, but her breasts and genital area are obscured by black boxes superimposed on the photograph. The final two photographs depict the victim's backside from the shoulder area to above the knees. One of these photographs shows the extent of skin breakdown on the victim's buttocks and tailbone area. The victim's tailbone area is depicted as, essentially, a large hole, where tissue should exist. The final photograph is a close view of the ulcer in the victim's tailbone area with a ruler at the base of the ulcer.

- 15 -

The medical examiner testified that this ulcer had been surgically debrided and, therefore, the size of the missing tissue was larger than it had been at the time of the victim's hospital admission.

Without question, the photographs are disturbing and carry with them some inherent prejudice due to their unpleasant nature. However, the photographs generally served to illustrate and further explain the nature of the victim's physical condition at the time of her death. The medical examiner contrasted the hospital photographs with the autopsy photographs to show the physical condition in which the victim arrived, the inevitable progression of the victim's physical decline, the ultimate futility of the medical treatment given to the victim, and the victim's physical condition at the time of her death. The photographs were relevant and probative of facts in issue. *See* Tenn. R. Evid. 401, 402.

The Defendants argue that the photographs were duplicative of the testimony of the treating and expert medical witnesses. *See State v. Collins*, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998) ("As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted.") As we have stated, the photographs were relevant to illustrate and further explain the medical witnesses' testimony. Significant issues in the present case were whether the Defendants should have recognized that the victim was receiving inadequate nutrition, hydration, and hygienic care and that her physical condition had deteriorated to the extent that serious bodily injury was resulting. *See* T.C.A. § 39-15-508(a)(2).

As we have stated, the trial court found that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. *See id.* at 403. We are mindful of our standard of review, requiring that we not disturb the trial court's ruling absent an abuse of discretion. To be sure, the five autopsy photographs are gruesome. They depict the victim's naked, though partially obscured, body, which is badly deteriorated in places. The victim's body is emaciated.

Affording deference to the trial court's ruling, we conclude that no abuse of discretion has been shown for four of the five photographs, exhibits 59 through 63. Their probative value was not substantially outweighed by the danger of unfair prejudice. The photographs of the victim's foot showed the result of her circulatory failure due to the Defendants' failure to provide her with adequate nutrition and hydration. As contrasted with the hospital photographs depicting the victim's feet, the autopsy photographs of her feet showed the extent of her feet's deterioration during her hospitalization, which the medical examiner testified was beyond the point that medical intervention could reverse. The photographs of her front side and back side showed her emaciation and the injuries she sustained as a result of the Defendants' neglect.

With respect to the close photograph of the debrided ulcer in her tailbone area, exhibit 64, we conclude that its probative value was substantially outweighed by the danger of unfair prejudice to the Defendants and that it should not have been admitted. The injury depicted in exhibit 64 is also shown in the photograph of the victim's backside, exhibit 63. Exhibit 64 is merely an enlarged view of the ulcer and is extremely gruesome. In the context of this case, Exhibit 64 had no additional probative value that was not already provided by exhibit 63. Although exhibit 64 depicts a ruler next to the ulcer to show its size, the other backside photograph, exhibit 63, depicts the scale of the ulcer on the victim's body and therefore illustrates its size. The medical examiner testified that the area depicted in exhibit 64 had been surgically debrided, resulting in enlargement of the area of missing tissue, and the inflammatory nature of this exhibit, depicting a cavernous absence of tissue in the victim's tailbone area, cannot be denied. Exhibit 64 was inflammatory and unfairly prejudicial. The court abused its discretion in admitting the closeup photograph, exhibit 64.

The question that remains is that of the effect of this error. Recognizing that all errors are not equal, our supreme court has established three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error. *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). The distinctions between these categories dictate the standards to be applied when determining whether a particular error is harmless. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). A trial court's error in admitting evidence under the Tennessee Rules of Evidence falls into the category of non-constitutional error, and harmless error analysis under Tennessee Rule of Appellate Procedure 36(b) is appropriate. *See State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014); *see also State v. James*, 81 S.W.3d 751, 763 (Tenn. 2002) (noting that "[h]armless error analysis applies to virtually all evidentiary errors other than judicial bias and denial of counsel"). Pursuant to Tennessee Rule of Appellate Procedure 36(b), the defendant bears the burden of showing that a non-constitutional error "more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b); *see Rodriguez*, 254 S.W.3d at 372.

Having considered the issues in the case, the evidence presented at the trial, and the relevant legal standard, we conclude that the admission of exhibit 64 was harmless. Although this photograph is disturbing, the evidence of the Defendants' guilt was overwhelming. The Defendants were the elderly victim's caregivers. The victim lived in the Defendants' home, where they kept her confined to the basement in deplorable conditions. Although the defense expert opined that the victim died from causes other than neglect resulting in malnutrition and, ultimately, serious bodily injury, the State offered overwhelming evidence that the Defendants neglected the victim by failing to provide the

victim with proper nutrition, hydration, living conditions, hygienic care, and medical services, resulting in serious bodily injury and, ultimately, death.

The Defendants are not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE